McGEE, Chief Judge.
 

 *589
 
 K.W. ("Respondent-Mother") appeals an order entered 31 August 2015 ceasing reunification efforts ("CRO") and an order entered 18 April 2016 terminating her parental rights ("TPR order"). After careful review, we affirm.
 

 *590
 
 I. Background
 

 Respondent-Mother's sixth child, P.T.W., was born on 7 April 2013. Respondent-Mother received no prenatal care throughout her pregnancy, and P.T.W. was born with a medical condition that caused his intestines to be outside his body. As a result, P.T.W. required multiple corrective surgeries and remained in the Neonatal Intensive Care Unit at Wake Medical Center ("WMC") until 15 May 2013. At the time of P.T.W.'s birth, Respondent-Mother did not have custody of any of her five other children.
 

 Wake County Human Services Child Protective Services ("WCHS") received an assist request from Vance County Department of Social Services ("VCDSS") on 22 April 2013 reporting conditions that had led to the removal of Respondent-Mother's five other children from her custody. The report cited Respondent-Mother's confirmed alcohol and drug abuse, past threats to harm her children, and sustained lack of employment. WMC staff later informed WCHS that, prior to the 22 April 2013 report, Respondent-Mother
 

 had been inconsistent with visit[ing P.T.W.] at the hospital, reported not having supplies for the baby, and was not prepared to provide appropriate care for her special needs infant. In addition ... [Respondent-Mother] appeared to have slurred speech and oppositional behaviors
 
 *846
 
 when talking to [WMC] staff, indicative of substance abuse.
 

 At WMC, Respondent-Mother identified Lynn Williams ("Williams") as P.T.W.'s father, but subsequently informed a WCHS social worker that she was unsure of P.T.W.'s paternity. DNA testing later confirmed Williams as P.T.W.'s father.
 
 [1]
 
 Respondent-Mother told WCHS she had recently secured her own housing, but could not afford to have the electricity turned on.
 

 WCHS filed a juvenile petition on 3 May 2013 alleging P.T.W. was dependent and in need of alternative placement by the State. WCHS was given non-secure custody of P.T.W. that same day.
 

 Respondent-Mother appeared at a child planning conference on 9 May 2013. WCHS recommended that Respondent-Mother "complete a mental health assessment and a substance abuse assessment and follow all recommendations, ... obtain/maintain stable and suitable housing and lawful income sufficient to meet the needs of her family, and follow
 
 *591
 
 the court orders from Vance County." Respondent-Mother reported she had obtained full-time employment and had completed her case plan with VCDSS. WCHS also recommended that Respondent-Mother be granted a one-hour supervised visit with P.T.W. once a week.
 

 Respondent-Mother underwent a mental health assessment on 24 May 2013 that resulted in a diagnosis of Adult Antisocial and Antisocial Personality Disorder. She also submitted to a substance abuse assessment on 3 June 2013 and was diagnosed with "Alcohol Abuse in partial remission." Respondent-Mother alleged that, on or around 1 June 2013, Williams slammed her against a wall and threatened to kill her. Respondent-Mother was granted an
 
 ex parte
 
 domestic violence protective order ("DVPO") against Williams on or around 3 June 2013.
 

 Following a review hearing on 12 June 2013, P.T.W. was adjudicated dependent by order entered 25 June 2013. The trial court ordered that Respondent-Mother
 

 a) continue to show proof of stable and suitable housing and lawful income to meet the needs of the child; b) complete a psychological evaluation and follow all recommendations; c) follow the recommendations of her substance [abuse] assessment by complying with random drug/alcohol screens; d) demonstrate knowledge learned from anger management and parenting classes in her social interactions and life choices and take a parenting class for infants and toddlers; e) complete SafeChild MOVE [Mothers Overcoming Violence through Education and Empowerment] program and demonstrate knowledge learned; [and] f) maintain contact with WCHS and notify the agency of any change in situation or circumstance within [five] business days.
 

 The court ordered that Respondent-Mother receive at least one hour a week of supervised visitation with P.T.W., and that WCHS "continue to make reasonable efforts to eliminate the need for placement of [P.T.W.] outside the home."
 

 In August 2013, the trial court approved placement of P.T.W. with Letha Richardson ("Richardson"), Respondent-Mother's cousin. However, multiple attempts by WCHS to contact Richardson about placing P.T.W. were unsuccessful and P.T.W. remained in WCHS custody. Respondent-Mother moved from Raleigh to Lillington, in Harnett County, on 3 September 2013. At the request of VCDSS, Harnett County Department of Social Services ("HCDSS") conducted a home study of
 
 *592
 
 Respondent-Mother's residence in Lillington. HCDSS informed VCDSS that it did not recommend placement of Respondent-Mother's children with her as of 27 November 2013.
 
 [2]
 
 Respondent-Mother moved to Fuquay-Varina, in Wake County, in January 2014.
 

 Between August 2013 and July 2015, the trial court held approximately eight review hearings to evaluate Respondent-Mother's
 
 *847
 
 compliance with P.T.W.'s case plan and WCHS's continuing efforts at reunification. Following a hearing on 16 May 2014, the trial court found that, since February 2014, Respondent-Mother had missed five of eleven scheduled visits with P.T.W. and, during the visits she did make, she was "not able to demonstrate skills taught in her parenting class." The trial court further found Respondent-Mother "d[id] not recognize how her mental health problems ... affect her ability to parent, and ha[d] not really begun any therapy as ordered." It further found Respondent-Mother had not "demonstrated that she can control her anger, as she continue[d] to demonstrate impulsive tendencies, making derogatory statements to ... her therapist, foster parents, and social workers." Additionally, the court found Respondent-Mother "continue[d] to have contact with [Williams] despite a DVPO that [was] in place and ... had ... call[ed] the police for [Williams] violating the order." The court ordered WCHS to cease reunification efforts with respect to Williams, but "continue to make reasonable efforts to work towards the reunification of [P.T.W.] with [Respondent-Mother]."
 

 At a hearing on 4 November 2014, the trial court found Respondent-Mother had (1) completed several court-ordered services, (2) enrolled herself in an anger management class, (3) demonstrated a better attitude in working with WCHS, (4) secured suitable housing in Fuquay-Varina, (5) obtained two part-time jobs, (6) had not had any positive drug screens, and (7) was "complying with the treatment recommendations of her psychological [assessment]." The court further found that if Respondent-Mother "continue[d] the progress in correcting the conditions which led to [P.T.W.'s] removal, it [would] be possible for the Court to return [P.T.W.] to a safe environment with her in the next [six] months."
 

 At a hearing on 17 December 2014, based on Respondent-Mother's continued progress, the trial court granted her two hours a week of unsupervised visitation with P.T.W. Following a hearing on 28 January 2015,
 
 *593
 
 the trial court increased Respondent-Mother's visitation with P.T.W. to one twenty-four hour unsupervised visit a week.
 

 Several weeks later, VCDSS informed WCHS that Respondent-Mother's five-year-old child had reported witnessing Respondent-Mother engaging in a sexual act with Respondent-Mother's oldest son. Upon receiving this information, WCHS reinstated supervised visitation between Respondent-Mother and P.T.W. Respondent-Mother filed a motion for review of the change in visitation on 13 April 2015. Following a hearing on 6 May 2015, the trial court found Respondent-Mother's behavior during visits with P.T.W. had become "inappropriate"
 
 [3]
 
 and that she had "presented zero evidence ... that remotely show[ed] that [P.T.W.] would be safe in her care." The court suspended Respondent-Mother's visitation with P.T.W. "indefinitely." Respondent-Mother moved to Farmville, in Pitt County, on or about 22 May 2015.
 

 WCHS submitted a court summary on 14 July 2015 in which it recommended that the trial court cease reunification efforts with Respondent-Mother and change the permanent plan for P.T.W. to adoption. Following a review hearing on 22 July 2015, the trial court ceased reunification efforts by order entered 31 August 2015. The trial court concluded that reunification efforts with Respondent-Mother would be inconsistent with P.T.W.'s "safety and need for a safe home within a reasonable time," and ordered WCHS to "make reasonable efforts aimed at achieving a permanent plan of adoption."
 

 WCHS filed a petition to terminate Respondent-Mother's parental rights with respect to P.T.W. on 9 October 2015. WCHS alleged that Respondent-Mother had "willfully abandoned [P.T.W.] for at least six months immediately preceding the filing of the Petition." Following a review hearing on 3-4 March 2016, the trial court terminated Respondent-Mother's parental rights by order entered 18 April 2016. Respondent-Mother
 
 *848
 
 appeals both the CRO and TPR order.
 
 [4]
 

 *594
 
 II. Sufficiency of CRO Findings
 

 A.
 
 Standard of Review
 

 Respondent-Mother first argues that certain "crucial" findings of fact in the trial court's CRO were not supported by the evidence and, as a result, the totality of the evidence did not support the trial court's ultimate finding that reunification efforts "would be inconsistent with [P.T.W.'s] safety and need for a safe home within a reasonable time." "This Court reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition."
 
 In re I.R.C.
 
 ,
 
 214 N.C.App. 358
 
 , 361,
 
 714 S.E.2d 495
 
 , 497 (2011) (citation and quotation marks omitted);
 
 see also
 

 In re N.G.
 
 ,
 
 186 N.C.App. 1
 
 , 10-11,
 
 650 S.E.2d 45
 
 , 51 (2007) ("An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." (citation and quotation marks omitted));
 
 In re Weiler
 
 ,
 
 158 N.C.App. 473
 
 , 477,
 
 581 S.E.2d 134
 
 , 137 (2003) ("In a permanency planning hearing held pursuant to Chapter 7B, the trial court can only order the cessation of reunification efforts when it finds facts based upon credible evidence
 
 presented at the hearing
 
 that support its conclusion of law to cease reunification efforts." (citation omitted) (emphasis added)). "The trial court's findings of fact are conclusive on appeal if supported by
 
 any
 
 competent evidence."
 
 In re L.M.T.
 
 ,
 
 367 N.C. 165
 
 , 168,
 
 752 S.E.2d 453
 
 , 455 (2013) (citation omitted) (emphasis added);
 
 see also
 

 Forehand v. Forehand
 
 ,
 
 238 N.C.App. 270
 
 , 273,
 
 767 S.E.2d 125
 
 , 128 (2014) ("Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding." (citation and quotation marks omitted)). This is true "even where some evidence supports contrary findings."
 
 In re A.J.M.
 
 ,
 
 177 N.C.App. 745
 
 , 748,
 
 630 S.E.2d 33
 
 , 35 (2006) (citation and quotation marks omitted). Unchallenged findings "are deemed to be supported by sufficient evidence and are [also] binding on appeal."
 
 In re M.D.,
 

 200 N.C.App. 35
 
 , 43,
 
 682 S.E.2d 780
 
 , 785 (2009).
 

 B.
 
 Analysis
 

 Our Juvenile Code provides that
 

 [i]n any order placing a juvenile in the custody or placement responsibility of a county department of social services, ... the court may direct that reasonable efforts to eliminate the need for placement of the juvenile shall not be required or shall cease if the court makes written findings of fact that:
 

 *595
 
 (1) Such efforts clearly would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time[.]
 

 N.C. Gen. Stat. § 7B-507(b)(1) (2013).
 
 [5]
 

 See
 

 In re I.R.C.
 
 ,
 
 214 N.C.App. at 362
 
 ,
 
 714 S.E.2d at 498
 
 ("When a trial court is required to make findings of fact, it must make the findings of fact specially. ... [It] may not simply recite allegations, but must through processes of logical reasoning from the evidentiary facts find the ultimate facts essential to support the conclusions of law." (citation and quotation marks omitted)). In the present case, in accordance with N.C.G.S. § 7B-507(b)(1), the trial court found that reunification efforts with Respondent-Mother would be "inconsistent with [P.T.W.'s] health, safety and need for a safe, permanent home within a reasonable time." This finding followed numerous, more specific findings of fact.
 

 We consider whether the specific findings of fact Respondent-Mother challenges were supported by competent evidence presented
 
 *849
 
 at the cease reunification hearing and whether, considered together, the findings supported the trial court's ultimate statutory finding that reunification efforts would be inconsistent with P.T.W.'s health, safety, and need for a safe, permanent home within a reasonable time.
 
 [6]
 

 1. Alleged Sexual Abuse by Respondent-Mother
 

 Respondent-Mother first contends there was no credible evidence to support "the existence of a sexual relationship between" Respondent-Mother and her oldest son. Respondent-Mother characterizes the alleged sexual abuse as "the gravamen of the cease reunification order."
 

 *596
 
 The trial court found that
 

 [Respondent-Mother's] visits were suspended ... in May 2015 due to allegations that she and her [eighteen]-year old son had a sexual relationship. This inappropriate relationship was disclosed by another child of [Respondent-Mother]. Vance County Department of Social Services substantiated the abuse.
 

 As an initial matter, we disagree with Respondent-Mother's assertion that the alleged sexual abuse was the "gravamen"
 
 [7]
 
 of the trial court's decision to cease reunification efforts. The CRO explicitly incorporated by reference a court summary prepared by WCHS, submitted to the trial court on 14 July 2015 and admitted into evidence without objection at the hearing on 22 July 2015.
 
 See
 

 In re R.A.H.
 
 ,
 
 182 N.C.App. 52
 
 , 60,
 
 641 S.E.2d 404
 
 , 409 (2007) (holding that "[DSS] reports constitute competent evidence, and the trial court properly relied upon them in reaching its finding of fact."). The WCHS report reviewed the case history extensively, including reunification efforts undertaken by WCHS, and listed the following factors in support of ceasing reunification:
 

 [Respondent-Mother] [1] has not provided documentation of lawful income[;] ... [2] has been evicted from her last address in Wake County[;] ... [3] caused significant damage to the rental home at the time of the eviction[;] ... [4] has not followed the recommendations of her psychological [assessment][;] ... [5] is unable to consistently demonstrate skills learned in parenting class during her interactions with [P.T.W.][;] ... [6] did not start anger management class until 8/2014[;] [7] has been unable to demonstrate skills learned in Anger Management [classes][;] [8] has not complied with [her] Vance County DSS [case plan], [and] that agency is in the process of terminating her parental rights[;] ... [9] has not maintained an environment conducive to the safety and protection of [P.T.W.][;] ... [10] did not attend an initial mental health appointment until 4/7/14[;] ... [11] stated to the clinicians at Monarch that she did not need mental health treatment[;] ... [12] has not demonstrate[d] skills learned in the MOVE program in her life choices and interactions with others[;]
 

 *597
 
 ... [13] continued to visit with ... Williams while he was in jail despite a DVPO in place[;] ... [14] [Respondent-Mother] and ... Williams were seen together following [Respondent-Mother's] visitation with [P.T.W.] on 2/15/14 despite [Respondent-Mother] having a DVPO against ... Williams[;] [and] [15] Substantiated CPS case for sex abuse by Vance County DSS 6/2015.
 

 Additionally, when the trial court orally reviewed its findings in support of ceasing reunification at the conclusion of the CRO hearing on 22 July 2015, it made
 
 no mention
 
 of the sexual abuse allegations. Thus, it is clear the alleged sexual abuse was merely one among many circumstances the trial court considered in rendering its ultimate decision to cease reunification efforts.
 

 *850
 
 The WCHS report prepared in advance of the cease reunification hearing stated that on 25 February 2015,
 

 WCHS was made aware of a new allegation in regards to sex abuse between [Respondent-Mother] and her oldest son. The allegations of sex abuse were substantiated at the conclusion of the Child and Family Evaluation [conducted by Vance County DSS]. Vance County DSS has made the steps to put [Respondent-Mother] on the ... Responsible Individuals List. In addition, the police investigation is currently on-going with an outcome in regards to charges being filed to be made in the next week or two.
 

 At the cease reunification hearing, WCHS social worker Mary Torr ("Torr) testified that, in June 2015, "Vance County [DSS] substantiated a case for sex abuse against [Respondent-Mother]." Torr told the court that "the allegations were that one of [Respondent-Mother's] younger children was forced to watch [Respondent-Mother] inappropriately touch her oldest son.... And a CME and [Child and Family Evaluation ("CFE") ] were done. Vance County did substantiate and the police are still currently completing their investigation."
 

 Torr was then asked to explain the process of "CME/CFE substantiation." Torr told the court that in Respondent-Mother's case,
 

 Vance County [DSS] [was] the one [who made the determination]. It's not an opinion-based decision. [It is] [a]lso based on all of the evidence that was collected during the actual investigation. That included interviews with various people, it included what happened during the
 
 *598
 
 CME and what information was provided during the CFE that was completed, and then based on all of that information, then that case would have been staffed in Vance County, and they ... made a decision that, based on all the evidence that they had, that the allegations were in fact true.... The social workers don't make the decisions independently. Everything is a decision that comes with a discussion, a staffing with additional social workers, with supervisors, sometimes people that are higher up in the chain of command.
 

 Torr's testimony and the DSS report constituted sufficient evidence to support the trial court's finding that "[VCDSS] substantiated abuse." Importantly, the trial court did
 
 not
 
 find that sexual abuse in fact occurred or was committed by Respondent-Mother, or, as Respondent-Mother phrases it, "the existence of a sexual relationship between [Respondent-Mother and her oldest son]." The trial court found only that VCDSS "substantiated abuse," a process Torr described at length during the hearing.
 
 [8]
 

 2. Respondent-Mother's Parenting Skills
 

 Respondent-Mother also argues the evidence did not support the trial court's finding that she "ha[d] not demonstrated sustained parenting improvements during the last two years." In support of this argument, Respondent-Mother points to court orders from November 2014, December 2014, and January 2015 that indicated Respondent-Mother was making progress during her visits with P.T.W. and which increased her visitation rights. However, Respondent-Mother did not offer these specific examples at the cease reunification hearing.
 

 On the other hand, the WCHS court summary introduced without objection at the cease reunification hearing indicated the following:
 

 [Respondent-Mother] has been unable to show sustained changes in her parenting over the past two years. Early on, [Respondent-Mother] would use her cell phone throughout visits instead of paying attention to [P.T.W.]. During an office visit, [P.T.W.] cried for nearly [two] hours and [Respondent-Mother] did not respond to directions to comfort [him].... [Respondent-Mother] has used her visitation as an opportunity to [make unrelated phone calls]. [Respondent-Mother] has made numerous inappropriate
 
 *599
 
 comments in visitations including asking her oldest son if he wanted to kiss [P.T.W.'s] behind while
 
 *851
 
 she was changing the diaper, talking about sexual relationships, telling her other son that she was going to dress him up in an adult diaper and take pictures, discussing whooping's [sic], and needing to get her sex look on for a picture to be taken.
 

 The report also documented Respondent-Mother's "sporadic" visitation attendance throughout the previous two years. Torr testified that Respondent-Mother had "been unable to consistently demonstrate skills learned in parenting classes during her interactions with [P.T.W.]" Torr also testified that, between the time WCHS reinstated supervised visitation in February 2015 and the time Respondent-Mother's visitation was suspended altogether in May 2015, "the visits [with P.T.W.] did not go well[.]" Respondent-Mother did not offer contrary evidence at the cease reunification hearing.
 
 See
 

 In re M.J.G.
 
 ,
 
 168 N.C.App. 638
 
 , 643-44,
 
 608 S.E.2d 813
 
 , 816-17 (2005). Thus, the evidence was sufficient to support the trial court's finding that Respondent-Mother had not "demonstrated sustained parenting improvements during the last two years."
 

 3. History of Family Violence
 

 Respondent-Mother next argues there was insufficient evidence to support the trial court's finding that she "display[ed] zero awareness of or insight into her own past of domestic violence with [P.T.W.'s] father." Respondent-Mother does not challenge the court's finding that she "continued to visit [Williams] in jail despite filing a [DVPO] against him," and admits as much in her brief to this Court.
 

 The WCHS court summary indicated the following:
 

 [Respondent-Mother] had had [sic] a pattern of violence in her relationship with [Williams]. [Respondent-Mother] took out a DVPO against [Williams] on [4 June 2013]. In that DVPO, [Respondent-Mother] described a [domestic violence] incident that took place between her and [Williams] where he pushed her against the wall and twisted her arm back. [Respondent-Mother] had several of her children in the home with her for a visitation when this incident happened. In the DVPO complaint, [Respondent-Mother] also stated that [Williams] was "always threatening to kill [her]," that [Williams] went to jail in October of 2012 for assaulting [her], that she was going to get a DVPO in December of 2012 but that [Williams] had talked her out of it, and that [Williams] had strangled [her] when she was pregnant with [P.T.W.].
 

 *600
 
 [Respondent-Mother] did complete the MOVE program. However, [Respondent-Mother] reported that she "loved going to the classes because she was fascinated by women that allow men to beat on them[.]"
 

 Despite having a DVPO in place against [Williams], [Respondent-Mother] would visit with [Williams] while he was in jail. [A social worker] observed [Respondent-Mother] and [Williams] walking to the bus stop together after a visitation at Millbrook. During a visitation on [10 June 2014], [Respondent-Mother] reported that she and [Williams] were going to be getting married, possibly before the end of the year.
 

 Torr testified at the cease reunification hearing that Respondent-Mother "continued to visit with [Williams] ... while he was in jail and after he was in jail, despite [a] domestic violence protection order being in place."
 

 Respondent-Mother presented no evidence at the cease reunification hearing tending to contradict the foregoing testimony. Respondent-Mother does not dispute evidence of domestic violence with Williams, or that she maintained contact with Williams while the DVPO was in effect. Respondent-Mother's only argument is that "there was no evidence [she] had seen [Williams] since May 2014, other than possibly 'walking to the bus stop together, ' " which she does not explicitly deny. However, the trial court did
 
 not
 
 find that Respondent-Mother had in fact seen Williams since May 2014, nor did it imply, as Respondent-Mother suggests, that she and Williams "were currently involved in domestic violence[.]" It found only that Respondent-Mother lacked "awareness of or insight into her own
 
 past
 
 of domestic violence with [Williams]." This finding was supported by the WCHS court summary as well as Torr's testimony at the hearing.
 

 *852
 
 4. Therapy Engagement
 

 Respondent-Mother also challenges the trial court's finding that she "ha[d] not reengaged in therapy" since moving to Pitt County. We agree this finding was not supported by evidence presented at the cease reunification hearing.
 

 The WCHS court summary contained no information regarding Respondent-Mother's therapy (or lack thereof) since her move to Pitt County, which Respondent-Mother testified occurred on or about 22 May 2015. The report detailed Respondent-Mother's therapy participation while she was still residing in Wake County, and noted that
 
 *601
 
 Respondent-Mother had worked with the same mental health provider for approximately one year while living in Fuquay-Varina.
 

 Respondent-Mother was evicted from her home in Fuquay-Varina on or about 21 May 2015. Respondent-Mother testified she notified Torr by voicemail that she had left the home, although it is unclear whether Respondent-Mother indicated she would be moving to Pitt County or if she provided a new address. Torr testified she could not understand a lot of Respondent-Mother's voicemail due to poor cell phone reception, but that she "did hear that [Respondent-Mother] had left ... Wake County." Torr did not testify at the cease reunification hearing regarding Respondent-Mother's involvement in therapy after leaving Wake County.
 

 Respondent-Mother did testify about efforts she made to resume the court-ordered therapy after moving to Pitt County:
 

 Q: Okay. Let's see. Are you still working with your [Wake County] therapist?
 

 [Respondent-Mother]: No. When I moved to Pitt County, I called Mary Torr and I left her a voicemail because I knew I had five days to report my move. I called her on the fourth day, and ... I told [her] that ... I ha[d] moved to ... Farmville, North Carolina, and I had set an appointment up in Pitt County Mental Health and I asked [Torr] on that voice call could she please help me with [therapy] service there. I said, you do know, in order for me to have my son, I have to continue with therapy. Will you please help me find a therapist there. [Torr] never returned my call.
 

 ...
 

 Q: So the reason that you're changing therapists is because of your change of address to a different address?
 

 [Respondent-Mother]: Yes.
 

 Q: And what you're doing is you're looking to get some help for a referral to [a] particular person over in Pitt County?
 

 [Respondent-Mother]: Yes, I went one time. My appointment was [in] June.... [The therapist's] name is Ms. Jennifer, and I went to see her and she told me, because I had been in outpatient therapy for over a year, she is not going to recommend seeing me ... [more than] once a
 
 *602
 
 month, and I had an appointment with her last week and I missed that appointment.
 

 When Respondent-Mother was asked whether she was "able to set up the appointment with the Pitt County therapist on [her] own," Respondent-Mother testified: "Yes, ma'am, because I called [Torr] and she never returned my call, so I did it on my own." Thus, the only evidence presented at the cease reunification hearing regarding Respondent-Mother's therapy since moving to Pitt County indicated Respondent-Mother had made some effort to continue therapy, and that she had met with a provider in Pitt County on at least one occasion. In the absence of any evidence to the contrary, the trial court's finding that Respondent-Mother "ha[d] not reengaged in therapy" since moving to Pitt County was not supported by the evidence.
 
 See
 

 In re M.J.G.
 
 ,
 
 168 N.C.App. at 646
 
 ,
 
 608 S.E.2d at 818
 
 .
 

 Notwithstanding this conclusion, we hold that the remaining findings of fact support the trial court's ultimate decision to cease reunification efforts.
 

 Id.
 

 ;
 
 see also
 

 In re K.S.
 
 ,
 
 183 N.C.App. 315
 
 , 329-30,
 
 646 S.E.2d 541
 
 , 549 (2007) (holding that, although one of the trial court's findings was not supported by competent evidence, "the remaining findings of fact ... [were] sufficient to support the trial court's conclusion that ... reasonable efforts to reunify should be suspended.").
 

 *853
 
 5. Anger Management
 

 Respondent-Mother argues the trial court erroneously found that, despite attending anger management classes, Respondent-Mother "[had] consistently demonstrate[d] that she cannot control her emotions." However, Respondent-Mother does not challenge the trial court's related findings that she had "call[ed] social workers names, yell[ed], use[d] profanity, abruptly end[ed] telephone conversations with the social worker and [was] generally combative," or that the trial court "ha[d] observed [Respondent-Mother's] combative demeanor in court." Respondent-Mother concedes she expressed "anger at the May [2015] hearing where her visits had been suspended[.]" Additionally, the WCHS court summary indicated Respondent-Mother's previous therapist had reported that, despite working on anger management issues for more than a year, Respondent-Mother "still had a lot of work to do." The trial court's finding that Respondent-Mother "consistently demonstrate[d] that she cannot control her emotions" was supported by competent evidence.
 

 6. Failure to Maintain Stable Housing
 

 Respondent-Mother lastly challenges the trial court's finding that she "does not maintain stable housing." Respondent-Mother concedes
 
 *603
 
 she was evicted from her home because the landlord obtained an eviction judgment against her on or about 11 May 2015. The WCHS court summary indicated that
 

 [t]he landlord reported [Respondent-Mother] caused significant damage to the home at a cost of several thousand dollars. Some of the damage included breaking all the windows in the house, pouring paint all over floors of the home and then pouring a [fifty] pound bag of dog food over the paint on the floors.
 

 Respondent-Mother did not offer any evidence to the contrary. On appeal, she notes only that "[t]he landlord did not testify at the cease reunification hearing and [Respondent-Mother] was not questioned about any damages to the property."
 

 In addition to the evidence regarding Respondent-Mother's recent eviction, Torr testified at the cease reunification hearing that Respondent-Mother had not provided a new address to WCHS since leaving Wake County, and Torr did not know where Respondent-Mother was then residing. We conclude there was competent evidence to support the trial court's finding that Respondent-Mother had failed to maintain stable housing.
 

 7. VCDSS Termination Proceedings
 

 Respondent-Mother alleges the trial court erroneously believed it was required to cease reunification efforts with respect to P.T.W., based on a statutory provision enacted shortly before the cease reunification hearing and which became effective 1 October 2015. N.C. Gen. Stat. § 7B-901(c)(2), which applies to initial dispositional hearings only, provides that
 

 [if] the disposition order places a juvenile in the custody of a county department of social services, the court shall direct that reasonable efforts for reunification ... shall not be required if the court makes written findings of fact pertaining to any of the following: ... A court of competent jurisdiction has terminated involuntarily the parental rights of the parent to another child of the parent.
 

 N.C. Gen. Stat. § 7B-901(c)(2) (2015).
 
 [9]
 

 *604
 
 Respondent-Mother's argument is without merit. There is no indication in the record that the trial court based its decision to cease reunification efforts on a finding or belief that Respondent-Mother's parental rights had been terminated with respect to any of her other children. On the contrary, the trial court
 
 explicitly
 
 stated that any VCDSS proceedings had no bearing on its decision to cease reunification with respect to P.T.W. After summarizing numerous factual findings
 
 *854
 
 supporting its decision to cease reunification, the court said:
 

 I know that Wake County mentioned that [Respondent-Mother] has a pending matter in Vance County where [a] termination [hearing], I believe, is set [for] today. However, I will say that the Court, given the fact that [that] may be something that's pending and has not occurred, I don't think, respectfully, the Court would use that as a reason to cease.
 

 The trial court was clearly not acting under a mistaken belief that it was required to cease reunification because Respondent-Mother's rights to any of her other children had already been terminated (much less pursuant to a statute that was not even in effect at the time). This argument is overruled.
 

 8. Findings in TPR Order
 

 Respondent-Mother contends that, because "the termination of parental rights order did not correct the deficiencies in the cease reunification order," the TPR order must be reversed along with the CRO. We disagree.
 

 In
 
 In re L.M.T.
 
 , our Supreme Court held that, because a CRO and TPR order must be reviewed together on appeal, "
 
 incomplete
 
 findings of fact in [a] cease reunification order may be cured by findings of fact in the termination order."
 
 367 N.C. at 170
 
 ,
 
 752 S.E.2d at 457
 
 (emphasis added). Thus, "[e]ven if [a] cease reunification order
 
 standing alone
 
 had been
 
 insufficient
 
 ," a reviewing court may look to the subsequent TPR order to determine whether, considered together, the trial court has made sufficient findings of fact under the former N.C.G.S. § 7B-507(b).
 

 Id.
 

 ,
 
 367 N.C. at 169-70
 
 ,
 
 752 S.E.2d at 456
 
 (emphases added);
 
 see also
 

 In re A.E.C.
 
 ,
 
 239 N.C.App. 36
 
 , 45,
 
 768 S.E.2d 166
 
 , 172 (2015) (holding "termination order, taken together with the earlier [permanency planning and cease reunification] orders, [did] not contain sufficient findings of fact to cure the defects in the earlier orders.").
 

 Respondent-Mother's argument that the TPR order failed to correct certain deficiencies in the CRO is premised upon a conclusion that there
 
 *605
 
 were deficiencies in the CRO which required correcting. Respondent-Mother essentially reasserts her arguments about the insufficiency of evidence at the cease reunification hearing with respect to three factual issues: (1) her ability to maintain stable housing, (2) the alleged sexual abuse of her oldest son, and (3) her alleged contact with Williams. However, as discussed above, we have already concluded that the evidence presented at the cease reunification hearing was sufficient to support the trial court's findings with respect to each of those issues. Thus, the CRO was not "deficient" on those grounds, and we need not consider whether the TPR "corrected" CRO findings which were based on competent evidence presented at the cease reunification hearing.
 

 III. Failure to Appoint Guardian
 
 Ad Litem
 

 A.
 
 Standard of Review
 

 Respondent-Mother argues the trial court abused its discretion by failing to appoint a guardian
 
 ad litem
 
 ("GAL") to represent P.T.W. at the termination hearing. She concedes that the trial court was not mandated by statute to appoint a GAL for P.T.W., either when WCHS first filed the dependency petition or at the termination hearing.
 
 See
 
 N.C. Gen. Stat. § 7B-601(a) (2015) (providing in part that "when a juvenile is alleged to be
 
 dependent
 
 , the court
 
 may
 
 appoint a guardian ad litem to represent the juvenile." (emphases added)); N.C. Gen. Stat. § 7B-1108(b) (2015) (requiring appointment of GAL in a termination proceeding "[i]f [a respondent files] an answer or response den[ying] any material allegation of the [termination] petition or motion[.]"). Because the appointment of a GAL in the present case was discretionary, the trial court's decision is reviewable for abuse of discretion only.
 
 See
 

 In re M.H.B.
 
 ,
 
 192 N.C.App. 258
 
 , 261,
 
 664 S.E.2d 583
 
 , 585 (2008). We note, however, that a trial court's complete failure to exercise discretion constitutes reversible error.
 

 Id.
 

 B.
 
 Analysis
 

 1. Preservation of Error
 

 In certain instances, a trial court must appoint a GAL for a juvenile, including where a petition alleges a juvenile is abused
 
 *855
 
 or neglected,
 
 see
 
 N.C.G.S. § 7B-601(a), or, in a termination proceeding, if a respondent files a written answer or response to the termination petition and "[the] answer or response denies any material allegation of the petition or motion,"
 
 see
 
 N.C.G.S. § 7B-1108(b). If a GAL was previously appointed pursuant to N.C.G.S. § 7B-601, and if appointment of a GAL "could also be made under [ N.C.G.S. § 7B-1108 ]," the GAL appointed under
 
 *606
 
 N.C.G.S. § 7B-601 "shall also represent the juvenile in all [termination] proceedings ... unless the court determines that the best interests of the juvenile require otherwise." N.C. Gen. Stat. § 7B-1108(d) (2015). However, if appointment of a GAL is not statutorily required, "the court may, in its discretion, appoint a [GAL] for a juvenile, either before or after determining the existence of grounds for termination of parental rights, in order to assist the court in determining the best interests of the juvenile." N.C. Gen. Stat. § 7B-1108(c) (2015).
 

 "This Court has previously held that in order to preserve for appeal the argument that the trial court erred by failing to appoint [a] child a GAL, a respondent must object to the asserted error below."
 
 In re A.D.N.
 
 ,
 
 231 N.C.App. 54
 
 , 65-66,
 
 752 S.E.2d 201
 
 , 209 (2013) (citing
 
 In re Fuller,
 

 144 N.C.App. 620
 
 , 623,
 
 548 S.E.2d 569
 
 , 571 (2001) ;
 
 In re Barnes
 
 ,
 
 97 N.C.App. 325
 
 , 326,
 
 388 S.E.2d 237
 
 , 238 (1990) ). In
 
 In re A.D.N.
 
 , the respondent-mother filed a response to a termination petition in which she denied many of the petition's material allegations. Accordingly, the trial court was required to appoint a GAL under the plain language of N.C.G.S. § 7B-1108(b). Despite the trial court's failure to do so, this Court held the respondent-mother did not preserve the issue for appeal because she "failed to object at trial to the failure of the trial court to appoint the child a GAL."
 

 Id.
 

 ;
 
 see also
 
 N.C.R. App. P. 10(a)(1) (2016) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make ... [and have] obtain[ed] a ruling upon the party's request, objection, or motion."). Similarly, in the present case, Respondent-Mother failed to object to the lack of a GAL for P.T.W. during the termination proceedings, and the issue was therefore not preserved for appellate review.
 

 As we observed in
 
 In re A.D.N.
 
 , in both
 
 Fuller
 
 and
 
 Barnes
 
 , "this Court invoked Rule 2 of the [North Carolina] Rules of Appellate Procedure in order to reach the [unpreserved] issue [of] whether the trial court erred by failing to appoint a GAL for the child and, in both cases, found prejudicial error in the failure to appoint a GAL."
 
 231 N.C.App. at 66
 
 , 752 S.E.2d at 209. Under Rule 2, we may suspend the Rules of Appellate Procedure if necessary "[t]o prevent manifest injustice to a party[.]" N.C.R. App. P. Rule 2 (2016);
 
 see also
 

 Stann v. Levine
 
 ,
 
 180 N.C.App. 1
 
 , 10-11,
 
 636 S.E.2d 214
 
 , 220 (2006) ("Our Supreme Court has described appropriate opportunities for the invocation of Rule 2 as 'rare occasions' and 'in exceptional circumstances,' and a thorough review of the Court's Rule 2 jurisprudence supports such characterizations." (citations omitted)).
 

 *607
 
 In
 
 In re A.D.N.
 
 , in declining to invoke Rule 2, our Court found
 
 Fuller
 
 and
 
 Barnes
 
 factually distinguishable. We noted that "there [was] no indication in [
 
 Fuller
 
 and
 
 Barnes
 
 ], as there [was] here, that the appealing respondent had repeatedly chosen substance abuse over the child's welfare throughout the child's life and had almost entirely abdicated responsibility for the child[.]"
 
 In re A.D.N.
 
 ,
 
 231 N.C.App. at 66
 
 , 752 S.E.2d at 209.
 

 We find Respondent-Mother's case more akin to
 
 In re A.D.N.
 
 than either
 
 Fuller
 

 or
 

 Barne
 

 s
 
 .
 
 [10]
 
 The CRO set forth a number of steps Respondent-Mother could take in order to reunify with P.T.W. There was evidence at the termination hearing that Respondent-Mother failed to meet many of those terms, including the requirements that she maintain suitable housing; maintain sufficient legal income; maintain regular contact
 
 *856
 
 with WCHS; demonstrate learned anger management skills; demonstrate learned parenting skills; and comply with her VCDSS case plan. Torr testified that, at the time of the termination hearing, WCHS "ha[d] not received any documentation [from Respondent-Mother] of safe or suitable housing." Although Respondent-Mother brought a copy of a lease with her to the termination hearing, she acknowledged she had never provided a copy to WCHS. Torr testified that Respondent-Mother had not provided any proof of income to WCHS since on or about 19 August 2013, shortly after P.T.W. was adjudicated dependent. There was evidence of Respondent-Mother's continuing issues with anger management, including during her last visitation with P.T.W., on 5 May 2015, when she "referred to [Torr] as a cracker and slammed the door ... while [Torr] was holding [P.T.W.]." There was evidence that Respondent-Mother had not demonstrated learned parenting skills over the preceding two years. Torr testified that during a 21 April 2015 visitation with P.T.W., Respondent-Mother
 

 was yelling in an open room about sex abuse allegations with both [P.T.W.] present and the child who was the subject of the allegation present, and she proceeded to spend the first [twenty] minutes of the visit kissing [P.T.W.] on the lips, despite him trying to get away from her and turning his face, and then told him that he needed to kiss her in order to get a toy back after she took the toy away from him.
 

 *608
 
 Respondent-Mother also did not maintain regular contact with WCHS following the cease reunification hearing. Respondent-Mother testified at the termination hearing that, despite earning "about $600" per week, she had not sent any financial support, clothing, or gifts for P.T.W. since her visitation was suspended in May 2015. Although the CRO ordered Respondent-Mother to "[f]ollow all recommendations of her psychological assessment," which included individual counseling, Respondent-Mother testified at the termination hearing that she last visited a therapist in late December 2015. Additionally, although the CRO ordered Respondent-Mother to "[c]omply with [her] Vance County DSS foster care case plan," both Respondent-Mother and her mother, Shirley Adams ("Adams"), testified at the termination hearing that they were actively violating a Vance County court-ordered custody arrangement with respect to another of Respondent-Mother's minor children.
 

 At the cease reunification hearing on 22 July 2015, the trial court stressed to Respondent-Mother that it was not terminating her parental rights, and that she could still take steps to reunify with P.T.W. Addressing Respondent-Mother directly, the trial court stated:
 

 You can still do what you need to do, and if in fact you do what you need to do and then something is presented to the Court where I have to make a decision about whether or not to terminate or continue this relationship [with P.T.W.], trust me, I'm going to be fair and impartial.... I have not terminated your parental rights. It's up to you. If you want to reunify [with P.T.W.] and do what you need to do, you know what you need to do.
 

 Notwithstanding these instructions, and the requirements specified in the CRO, Respondent-Mother failed in a number of ways to "do what [she] need[ed] to do" to reunify with P.T.W.
 

 At the termination hearing, the trial court asked Respondent-Mother: "Do you accept responsibility for any of the situations that you are in now?" She responded: "No, I don't. No, I don't, no, no." In light of Respondent-Mother's willful failure to make progress on her WCHS case plan, both before and after reunification efforts were ceased, and because a GAL appointment was not statutorily required, we do not find it necessary to invoke Rule 2 "to prevent manifest injustice" to either Respondent-Mother or P.T.W.
 
 See
 

 In re H.D.
 
 ,
 
 239 N.C. App. 318
 
 , 325,
 
 768 S.E.2d 860
 
 , 865 (2015) ("Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort.);
 

 *609
 

 In re C.M.
 
 ,
 
 183 N.C.App. 207
 
 , 211-12,
 
 644 S.E.2d 588
 
 , 593 (2007) (observing that as "[r]espondent mother had over two years ... to work on a case plan with DSS, she had ample time to follow through with the services designed to assist her in learning to parent.");
 
 In re O.C.
 
 ,
 
 171 N.C.App. 457
 
 , 464,
 
 615 S.E.2d 391
 
 , 395 (2005)
 

 *857
 
 (finding that, "even if respondent was entitled to a GAL for the ... earlier dependency proceedings, there [could not] be prejudice to her in the termination proceedings because she was not even entitled to the appointment of a GAL for the termination proceedings.").
 

 2. Abuse of Discretion
 

 Even if we were to reach the merits of this issue, Respondent-Mother's argument fails. As noted above, because appointment of a GAL for P.T.W. was entirely discretionary in this case, review is limited to determining whether the trial court abused its discretion. We find no indication that the trial court's non-appointment of a GAL to represent P.T.W. at the termination hearing was "manifestly unsupported by reason or ... so arbitrary that it could not have been the result of a reasoned decision."
 
 See
 

 In re T.L.H.
 
 ,
 
 368 N.C. 101
 
 , 107,
 
 772 S.E.2d 451
 
 , 455 (2015).
 

 Respondent-Mother maintains that, although appointment of a GAL was discretionary under N.C.G.S. § 7B-1108(b), "the trial court still had an obligation to consider whether appointment of a GAL was in [P.T.W.'s] best interest [pursuant to N.C.G.S. § 7B-1108(c) ]."
 
 [11]
 
 The purpose of a discretionary GAL appointment in a termination proceeding is "to assist the court in determining the best interests of the juvenile." N.C.G.S. § 7B-1108(c). As with the GAL appointment itself, the question of whether a GAL would "assist the court in determining the best interests of the juvenile" is a matter for the trial court to decide. On the record before us, Respondent-Mother has shown no reason to second-guess the
 
 *610
 
 trial court's apparent belief that a GAL was not necessary to assist it in determining P.T.W.'s best interests. During the best interests phase of the termination hearing, the trial court heard testimony from Torr, Respondent-Mother, and Adams. Torr testified about P.T.W.'s current foster care placement, his relationship with his foster parents, and his emotional and developmental needs. Torr also testified about WCHS efforts to investigate placing P.T.W. with a family member, including a visit Torr made to Adams's home in Henderson several months prior.
 

 The trial court heard testimony from Respondent-Mother about her current living arrangement, employment, drug and alcohol abstinence, and family support system. Finally, the trial court heard testimony from Adams about her desire and ability to assume P.T.W.'s care and custody. The trial court's comments at the conclusion of the termination hearing clearly demonstrate that P.T.W.'s best interests were carefully weighed against the evidence presented. There is nothing to suggest it was unreasonable for the trial court to forego GAL assistance in determining P.T.W.'s best interests.
 

 We conclude Respondent-Mother failed to preserve this argument for appellate review. Even if the issue was reviewable, we find no abuse of discretion occurred.
 

 IV. Conclusion
 

 We affirm the trial court's 31 August 2015 order ceasing reunification efforts with Respondent-Mother and the 18 April 2016 order terminating Respondent-Mother's parental rights.
 

 AFFIRMED.
 

 Judges DIETZ and TYSON concur.
 

 [1]
 

 Williams's parental rights were terminated by the same order Respondent-Mother appeals, but Williams is not a party to the present appeal.
 

 [2]
 

 In a court summary dated 14 July 2015, WCHS indicated "[this] denial was due to numerous concerns in regards to [Respondent-Mother], not the physical structure of the home."
 

 [3]
 

 Specifically, the trial court found that, during visits with P.T.W., Respondent-Mother "ma[de] phone calls instead of interacting with [P.T.W.], call[ed] the social worker derogatory names, and ma[de] comments that [were] inappropriately sexual in nature."
 

 [4]
 

 Respondent-Mother appeals the TPR order only insofar as it failed to correct alleged deficiencies in the CRO.
 

 [5]
 

 As the parties observe, the General Assembly amended N.C.G.S. § 7B-507 in 2015, and cessation of reunification is now governed by other statutory provisions. However, those amendments became effective after Respondent-Mother's cease reunification hearing and entry of the CRO at issue in this case. Accordingly, for purposes of this opinion, citation is made to the statute applicable at the time of the cease reunification hearing and entry of the CRO.
 

 [6]
 

 We note that N.C.G.S. § 7B-507(b) permitted the court to order that reunification efforts shall
 
 either
 
 "not be required
 
 or
 
 shall cease." (emphasis added). We underscore this because, at Respondent-Mother's cease reunification hearing, the trial court stressed it was only directing that WCHS would no longer be required to make reasonable efforts at reunification, and that it was not terminating Respondent-Mother's parental rights or foreclosing her ability to take steps toward reunification.
 

 [7]
 

 Black's Law Dictionary
 
 defines "gravamen" as "[t]he substantial point or essence of a claim, grievance, or complaint."
 
 Black's Law Dictionary
 
 721 (8th ed. 2004).
 

 [8]
 

 The subsequent TPR indicated no criminal charges were ever filed against Respondent-Mother related to the sex abuse allegations.
 

 [9]
 

 N.C. Gen. Stat. § 7B-901(c) was amended by S.L. 2016-94, § 12C.1.(g) (eff. 1 July 2016) to provide that "the court shall direct that reasonable efforts for reunification ... shall not be required if the court makes written findings of fact pertaining to any of the following,
 
 unless the court concludes that there is compelling evidence warranting continued reunification efforts
 
 ...." (emphasis added).
 

 [10]
 

 We also observe that, in contrast to Respondent-Mother's case, in
 
 Fuller
 
 ,
 
 Barnes
 
 , and
 
 In re A.D.N.
 
 , the trial courts' failure to appoint a GAL expressly violated N.C.G.S. § 7B-1108(b) or its statutory predecessor. Respondent-Mother acknowledges that she "filed no answer to the [termination] petition, so no GAL was automatically triggered under [N.C.G.S.] § 7B-1108(b)."
 

 [11]
 

 Although not cited by Respondent-Mother, N.C. Gen. Stat. § 7B-1108.1 provides that, in a TPR proceeding, the trial court "
 
 shall
 
 conduct a pretrial hearing" (either separately or in combination with the adjudicatory hearing) and shall consider,
 
 inter alia
 
 , "[w]hether a guardian ad litem should be appointed for the juvenile, if not previously appointed." N.C. Gen. Stat. § 7B--1108.1(a)(2) (2015) (emphasis added). Thus, while N.C.G.S. § 7B-1108(c) uses permissive language (
 
 i.e.
 
 , "the court may, in its discretion, appoint a guardian ad litem for a juvenile...."), N.C.G.S. § 7B-1108.1 requires the trial court to affirmatively consider whether a GAL should be appointed for the termination hearing.
 
 See
 

 In re Z.T.B.
 
 ,
 
 170 N.C.App. 564
 
 , 569,
 
 613 S.E.2d 298
 
 , 300 (2005) ("The use of the word 'shall' by our Legislature has been held by this Court to be a mandate, and the failure to comply with this mandate constitutes reversible error."). We are unable to discern from the record on appeal whether the trial court conducted a hearing, pursuant to N.C.G.S. § 7B-1108.1, at which it considered whether a guardian ad litem should have been appointed for P.T.W. at the termination hearing. However, Respondent-Mother has not alleged the trial court violated N.C.G.S. § 7B-1108.1, and we do not decide the issue.