IN THE MATTER OF: Y.Y.E.T., Minor child

No. COA10-14

(Filed 6 July 2010)

**1. Termination of Parental Rights— grounds—abused and neglected**

The trial court did not err in a termination of parental rights case by concluding by clear, cogent, and convincing evidence that grounds existed to terminate respondents' parental rights under N.C.G.S. § 7B-1111(a)(1) based on the fact that the minor child was abused and neglected. Respondents were held jointly and individually responsible for their child's injury even though neither parent accepted responsibility.

**2. Termination of Parental Rights— best interests of child— abuse of discretion standard**

The trial court did not abuse its discretion by concluding that it was in the best interest of the minor child that respondent father's parental rights be terminated. Respondent failed to acknowledge why his child was placed in the custody of the

**IN RE Y.Y.E.T.**

[205 N.C. App. 120 (2010)]

Department of Social Services and also failed to exhibit changed behavior. Further, compliance with the case plan was not one of the factors the trial court was required to consider in making the best interest determination under N.C.G.S. § 7B-1110(a).

Appeal by Respondents from order entered 17 September 2009 by Judge Hugh B. Lewis in District Court, Mecklenburg County. Heard in the Court of Appeals 28 April 2010.

*Kathleen Arundell Widelski, Senior Associate Attorney, for ·Petitioner-Appellee Mecklenburg County Department of Social Services, Youth and Family Services.*

*Pamela Newell Williams, for Guardian ad Litem.*

*Robert W. Ewing, for Respondent-Appellant Mother.*

*David A. Perez, for Respondent-Appellant Father.*

STEPHENS, Judge.

Respondents appeal from the trial court's order terminating their parental rights to the minor child, Y.Y.E.T.[1] For the reasons stated herein, we affirm the order of the trial court.

## I. *Factual Background and Procedural History*

Y.Y.E.T. was born to Respondents on 15 April 2007. Mecklenburg County Department of Social Services ("DSS") first became involved in this matter on 28 August 2007 after Y.Y.E.T. was admitted to Carolinas Medical Center with a swollen leg on 23 August 2007. Y.Y.E.T. was diagnosed with a bucket handle fracture of the right femur which went through the growth plate. Additionally, Dr. Carmen Talarico, an expert in pediatric radiology, discerned a separation of the periostium from a significant portion of the bone mass, and radiological studies indicated other abnormalities, including a possible shoulder fracture. On 28 August 2007, DSS filed a petition alleging Y.Y.E.T. was abused and neglected as defined by N.C. Gen. Stat. §' 7B-101(1) and (15). That same day, DSS was granted nonsecure custody of Y.Y.E.T. and the child was placed in foster care. In its petition, DSS alleged that Respondent-mother initially stated the child's leg was caught between the bars of the crib and that she removed the child from the crib. Respondent-mother later stated that Respondent-father removed the child from the crib. Re-

---

1. Initials have been used throughout to protect the identity of the juvenile.

spondents' explanation as to how Y.Y.E.T.'s leg was injured was inconsistent with the injuries incurred.

An adjudication hearing was held on 16 November 2007, following which the trial court entered an order on 14 December 2007 adjudicating Y.Y.E.T. to be abused and neglected. The trial court found that Respondents indicated that the child's injury was caused by the child's leg getting stuck in the bars of the crib. Respondent-mother also believed the injury could have been caused by an immunization the child received. The trial court made the following additional findings of fact in its adjudication order:

6. Dr. [Steven] Frick and Dr. [Carmen] Talarico diagnosed a bucket handle fracture of the right femur. The fracture went through the growth plate. Additionally, Dr. Talarico discerned a separation of the periostium from a significant portion of the bone mass. The periostium is normally tightly attached to the bone, especially at the ends of the bone. The separation extended a long way up the bone, which indicated that a large amount of force was used. Extreme pressure by grabbing or squeezing or shaking was required to cause the injury. It would be like trying to remove a stuck lid from a jar or twisting an onion causing separation of the layers. This type of injury is non-accidental because to occur it required torque exerted on the limb from the external force of twisting.

7. The child is too young to cause this type of injury. A four to five month old child's leg would slide easily in and out from between the crib slats and the child's father told a [DSS] investigator that he removed the child gently from the crib. The parents' explanation of the reason for the injury does not match the injury.

8. The injury is highly specific of child abuse in an infant of four months of age and could not have occurred from the child's leg being stuck between the rails of the child's crib. This type of trauma has been defined as being caused exclusively by non-accidental trauma. There was no abnormality of bone structure that would provide a medical explanation for these injuries such as by bone disease.

9. There was a two day delay in the parents' getting the child to the hospital.

10. Radiological studies indicated other abnormalities, including one to the shoulder. These could be other fractures, though not acute. Subsequent studies revealed a prior injury to the child's shoulder. The other injuries were not studied further as they were not in need of treatment. The other injuries might could be explained away, but not the injury to the shoulder.

11. The parents were the sole care providers for the child.

Based on the above findings of fact, the trial court concluded that Y.Y.E.T. was an abused and neglected child as defined by N.C. Gen. Stat. [§] 7B-101. The trial court continued legal custody of Y.Y.E.T. with DSS with placement of the child in foster care. At that time, the trial court also ordered that DSS "should make reasonable efforts to eliminate the need for placement of the [child] and make it possible for the child to safely return to his/her own home and the parent[s'] care." Respondents did not appeal from the trial court's adjudication and disposition order, and thus, this order and the findings and conclusions contained therein are binding on the parties. *In re Wheeler*, 87 N.C. App. 189, 194, 360 S.E.2d 458, 461 (1987) ("Because no appeal was taken or other relief sought from the [adjudication and dispositional] order, it remained a valid final order which was binding in the later proceeding on the facts regarding abuse and neglect which were found to exist at the time it was entered.").

A review hearing was held on 22 May 2008, at which the trial court found that DSS had requested parenting capacity evaluations in order to seek direction in recommending services for the parents, but the information given by the parents in the evaluation was considered invalid. Thus, the evaluator could not make any recommendations. The trial court had hoped that the parenting capacity evaluations would identify who caused the child's injuries and why. The trial court's goal was to establish a level of culpability for the parents, so the trial court could determine whether reunification with a non-offending parent could occur or if issues with an offending parent could be rectified so that the child could be returned to her home. At the time of the May 2008 review hearing, the trial court had exhausted the available resources for determining who had caused Y.Y.E.T.'s injuries other than the possibility of a forensic interrogation, which could possibly result in criminal charges against one or both parents. Thus, the trial court found that reasonable efforts toward reunification would be futile and would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reason-

able period of time. The trial court also found that Respondents had subjected the child to aggravated circumstances as defined in N.C. Gen. Stat. § 7B-101 as an additional basis for ceasing reasonable efforts. The trial court changed the permanent plan for the child to adoption.

On 12 August 2008, DSS filed a motion to terminate Respondents' parental rights ("TPR"), and on 28 August 2008, DSS filed an amended motion to terminate. On 6 May, 7 May, and 29 July 2009, the trial court held hearings on the TPR motion. On 17 September 2009, the trial court entered an order terminating Respondents' parental rights. The trial court made findings similar to those made in the adjudication order. The trial court also found that the child had remained in DSS custody since 28 August 2007 and that Respondents had completed parenting classes as required by their case plan. In addition, the trial court made the following pertinent findings:

> 29) The parents, as the only caretakers for the child, are responsible for the child's injuries. The Court cannot determine if a parent does not know what happened, knows what happened and will not tell on the other parent, or is the parent who inflicted the injuries. The Court currently cannot separate the parents as to culpability and has no way to address the issues as long as each parent maintains his/her current position that he or she did not injure the child and does not know how the child was injured.
>
> . . . .
>
> 43) When questioned by [Max] Nunez,[2] respondent-father provided different accounts of how he removed the juvenile from the crib back in August 2007. It sounded to the evaluator like the respondent-father was fitting the description of his motion to the twisting way that doctors indicated as the likely cause of the break to the femur.
>
> 44) Mr. Nunez did not recommend one way or another, if the juvenile should or should not return to the respondent-mother and/or respondent-father's custody. His recommendations included that if the Court were to return the juvenile to the parents, there should be ongoing monitoring of the child's wellbeing for as long as the Court can arrange.
>
> . . . .

---

2. Max Nunez is an expert in the field of parenting capacity evaluations. Mr. Nunez conducted the second parenting capacity evaluation of Respondents.

**IN RE Y.Y.E.T.**

[205 N.C. App. 120 (2010)]

52) Respondent-father did not believe the juvenile was injured when she was ordered into DSS custody.

53) During this termination of parental rights hearing, respondent-mother's explanation for the injury was that maybe there was an accident.

54) On the dates of this termination of parental rights hearing, the perpetrator of the juvenile's abuse still has not been identified. Respondent-mother and respondent-father were sole caretakers for the juvenile; however, neither respondent-mother nor respondent-father has accepted responsibility for the child's injuries.

Based on the foregoing findings of fact, the trial court made the following pertinent conclusions of law:

4) The Court hoped that the parenting capacity evaluations would identify who caused the injuries and why. The Court's hope was based on a level of culpability being established which would allow determination of whether reunification could occur with a non-offending parent or issues could be rectified with an offending parent so that the child could be returned to her home.

5) The Court has exhausted the available resources except for the possibility of a forensic interrogation, which could possibly lead to criminal charges against one, or both, of the parents.

6) Respondent-mother and respondent-father, as the only caretakers for the child, are responsible for the child's injuries. The Court cannot determine if a parent does not know what happened, knows what happened and will not tell on the other parent, or is the parent who inflicted the injuries. The Court currently cannot separate the parents as to culpability and has no way to address the issues as long as each parent maintains his/her current position that he or she did not injure the child and does not know how the child was injured.

. . . .

9) [Each parent] has abused and neglected the juvenile within the meaning of N.C. Gen. Stat. [§] 7B-101. The juvenile is less than 18 years of age and the parent inflicted or allowed to be inflicted upon the juvenile a serious physical injury by other than accidental means; created or allowed to be created a sub-

stantial risk of serious physical injury to the juvenile by other than accidental means. The juvenile did not receive proper care, supervision, or discipline from the parent and/or lived in an environment injurious to her welfare. Repetition of abuse or neglect is probable.

. . . .

14) The juvenile would be at risk if placed back in the home with the respondent-mother and/or the respondent-father because the perpetrator of the juvenile's injuries has never been identified.

Based on the foregoing findings of fact and conclusions of law, the trial court ordered that Respondents' parental rights to Y.Y.E.T. be terminated. From this order, Respondents appeal.

## II. Discussion

Proceedings to terminate parental rights occur in two phases: (1) the adjudication phase, and (2) the disposition phase. *In re Baker*, 158 N.C. App. 491, 493, 581 S.E.2d 144, 146 (2003). In the adjudication phase, the burden of proof is on the petitioner, findings made by the trial court must be supported by clear, cogent, and convincing evidence, and the findings must support a conclusion that at least one statutory ground for the termination of parental rights exists. *In re Shermer*, 156 N.C. App. 281, 285, 576 S.E.2d 403, 406 (2003). A trial court's determination that at least one ground for termination exists will be overturned only upon a showing by the respondent that there is a lack of clear, cogent, and convincing competent evidence to support the findings. *In re Allen*, 58 N.C. App. 322, 325, 293 S.E.2d 607, 609 (1982). The trial court's "findings of fact are conclusive on appeal if they are supported by 'ample, competent evidence,' even if there is evidence to the contrary." *In re J.M.W.*, 179 N.C. App. 788, 792, 635 S.E.2d 916, 919 (2006) (quoting *In re Williamson*, 91 N.C. App. 668, 674, 373 S.E.2d 317, 320 (1988)). "Once [the petitioner] has met its burden of proof in showing the existence of one of the grounds for termination, . . . the decision of whether to terminate parental rights is within the trial court's discretion." *In re Allred*, 122 N.C. App. 561, 569, 471 S.E.2d 84, 88 (1996). "The decision to terminate parental rights is vested within the sound discretion of the trial judge and will not be overturned on appeal absent a showing that the [trial court's] actions were manifestly unsupported by reason." *In re J.A.A.*, 175 N.C. App. 66, 75, 623 S.E.2d 45, 51 (2005).

**IN RE Y.Y.E.T.**

[205 N.C. App. 120 (2010)]

### A. Grounds to Terminate Respondents' Parental Rights

[1] Each Respondent argues[3] that the trial court erred in concluding that grounds existed to terminate their parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1). Pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), the trial court "may terminate the parental rights upon a finding [that the] parent has abused or neglected the juvenile." Specifically, Respondents argue that the trial court's findings of fact are not supported by clear, cogent, and convincing evidence, and thus, that the findings do not support the trial court's conclusions of law. Of the 58 findings of fact made by the trial court, Respondent-mother challenges only finding of fact 29,[4] and Respondent-father does not challenge any of the trial court's findings. Findings of fact which are not contested are "presumed to be supported by competent evidence and [are] binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).

Here, the trial court made a number of findings in addition to finding of fact 29, addressing the nature of the injury which led to Y.Y.E.T.'s removal from Respondents' care. Specifically, the trial court found (1) that the child's injury was not accidental, (2) that the child was too young to cause this type of injury to herself, (3) that her leg "was mishandled with extreme force[,]" (4) that the injury was highly specific of child abuse in an infant of four months of age, and (5) that Respondents brought Y.Y.E.T. to the hospital two days after the injury occurred. The trial court also found that Respondents were the sole care providers for the child when the injury occurred. As neither Respondent has argued on appeal that any of these findings are not supported by clear, cogent, and convincing competent evidence, they are presumed to be properly supported and are binding on this Court. *In re H.L.A.D.*, 184 N.C. App. 381, 397, 646 S.E.2d 425, 436 (2007) ("Findings of fact not argued on appeal are deemed to be supported

---

3. Respondent-mother and Respondent-father appeal from the trial court's order separately. However, because each parent argues that the trial court could not terminate his or her parental rights without specifying which parent was the perpetrator of the abuse, we address this issue as it applies to each parent together.

4. As stated above, the trial court's finding of fact 29 provides that "[t]he parents, as the only caretakers for the child, are responsible for the child's injuries. The Court cannot determine if a parent does not know what happened, knows what happened and will not tell on the other parent, or is the parent who inflicted the injuries. The Court currently cannot separate the parents as to culpability and has no way to address the issues as long as each parent maintains his/her current position that he or she did not injure the child and does not know how the child was injured."

by sufficient evidence, and are binding on appeal."), *aff'd per curiam*, 362 N.C. 170, 655 S.E.2d 712 (2008); N.C. R. App. P. 28(b)(6).

Additionally, in the adjudication and disposition order, which was received into evidence and considered by the trial court at the TPR hearing, the trial court found that Y.Y.E.T. had incurred other injuries prior to the August 2007 injury to the child's leg. Radiological studies revealed a prior injury to the child's shoulder and other abnormalities. The trial court found that the other injuries might be reasonably explained, but the injury to the child's shoulder could not be "explained away[.]" Although Respondents maintain that they do not know who caused Y.Y.E.T.'s leg injury, as they did not appeal from the adjudication and disposition order, Respondents are bound by the findings that Y.Y.E.T. had incurred other injuries prior to the August 2007 hospital visit, at least one of which was inexplicable. Thus, the findings in the adjudication and disposition order further support the trial court's finding in its TPR order that Y.Y.E.T. was abused and neglected pursuant to N.C. Gen. Stat. § 7B-1111(a)(1).

From the outset of DSS's involvement in this matter, DSS and the trial court have tried to determine which parent was the perpetrator of Y.Y.E.T.'s injury. DSS requested a temporary disposition by asking the trial court to order Respondents to participate in a parenting capacity evaluation, in the hope that this evaluation would aid DSS in determining the course of action that was in the best interest of Y.Y.E.T. Respondents completed the parenting capacity evaluation. However, at the 14 May 2008 review hearing, the trial court found that the information given by the parents in the evaluation was considered invalid and the evaluator could not make the requested recommendations. The trial court hoped that the parenting capacity evaluations would identify who caused the child's injury and why. If the evaluations had established a level of culpability as to each parent, the court could determine whether reunification could occur with a non-offending parent or if issues could be rectified with an offending parent so that the child could be returned to her home. At the time of the 14 May 2008 review hearing, the court had exhausted the available resources except for the possibility of a forensic interrogation, which could possibly lead to criminal charges against one or both of the parents.

The trial court pursued extensive efforts to determine which parent inflicted the injury on Y.Y.E.T. in August 2007. Despite the trial court's inability to conclusively determine who was the perpetrator of

the injury, the trial court's finding that both parents were responsible is nevertheless supported by clear, cogent, and convincing evidence. Y.Y.E.T.'s injury was not accidental and was found to be "highly specific of child abuse in an infant of four months of age[.]" As the child's sole care providers, it necessarily follows that Respondents were jointly and individually responsible for the child's injury. Whether each Respondent directly caused the injury by inflicting the abuse or indirectly caused the injury by failing to prevent it, each Respondent is responsible.

Furthermore, Respondents' refusal to accept responsibility for the child's injury indicates that the conditions which led to the child's initial removal from Respondents' home have not been corrected. It is apparent that one or both of Y.Y.E.T.'s parents inflicted an injury on the child and that the parents have protected each other throughout the course of these proceedings by refusing to identify the perpetrator. Respondents' conduct further indicates that Respondents continue to put their own self-interests first, and are not prepared to act in the best interest of their child. Respondents' willingness to return Y.Y.E.T. to the home and circumstances in which her injury occurred clearly demonstrates that Respondents are not devoted to the welfare of their child. Thus, the trial court properly determined that the repetition of abuse or neglect is probable.

Respondents argue, however, that the trial court erred in concluding that they each abused and neglected Y.Y.E.T. pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) without specifically finding that either Respondent was the perpetrator of the child's injury. Respondents' argument is flawed as we have held above that the trial court properly found Respondents were jointly and individually responsible for their child's injury. Furthermore, Respondents' argument is contrary to public policy and would establish a dangerous precedent should we be persuaded by their contention. Such a holding would encourage individuals to deny responsibility for and knowledge of harm inflicted upon a child and would thwart the ability of the courts to serve the best interest of the child.

Accordingly, we conclude that the trial court's findings are supported by clear, cogent, and convincing evidence.[5] These find-

---

5. Respondent-mother contends that the trial court's finding of fact 29 constitutes an abuse of discretion. We note, however, that the correct standard for reviewing the trial court's findings of fact is whether they are supported by clear, cogent, and convincing evidence. As we have held that finding of fact 29 was supported by such evidence, we need not address Respondent-mother's additional argument on this finding.

ings support the trial court's conclusion that grounds existed to terminate Respondents' parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1). Respondents' arguments are overruled. Having concluded that one ground for termination of parental rights exists, we need not address the additional ground found by the trial court. *In re Brim,* 139 N.C. App. 733, 743, 535 S.E.2d 367, 373 (2000).

### B. Best Interest of the Child

[2] Respondent-father also argues that the trial court abused its discretion by concluding that it was in the best interest of Y.Y.E.T. that Respondent-father's parental rights be terminated. Specifically, Respondent-father contends that the trial court "unnecessar[ily] sever[ed]" "the parental rights of a father who had [possibly] done nothing wrong[.]" We disagree.

"After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest." N.C. Gen. Stat. § 7B-1110(a) (2009). The decision of whether termination is in the best interest of the child is reviewed for an abuse of discretion. *In re Nesbitt,* 147 N.C. App. 349, 352, 555 S.E.2d 659, 662 (2001).

N.C. Gen. Stat. § 7B-1110(a) enumerates six factors that trial courts must consider when making a determination as to a child's best interest:

(1) The age of the juvenile.

(2) The likelihood of adoption of the juvenile.

(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

N.C. Gen. Stat. § 7B-1110(a) (2009).[6]

Respondent-father argues that he complied with the components of his case plan, and that he "did virtually all he could have done to

---

6. Respondent-father does not argue that the trial court failed to consider the proper statutory factors in reaching its best interest determination.

have been reunited with his daughter." Respondent-father maintained housing and employment throughout the evaluation period. Additionally, Respondent-father completed parenting classes which consisted of eleven sessions. At the beginning of the parenting classes, Respondent-father scored 63% out of 100% on an initial evaluation test, but he scored 93% out of 100% on the evaluation test at the conclusion of the parenting classes. Respondent-father also completed the court-ordered parenting capacity evaluation. However, as stated previously, the information given by both parents in the evaluation was considered invalid.

Although Respondent-father substantially complied with the case plan, the trial court found that "[t]he case plan is not just a check list. The parents must demonstrate acknowledgment and understanding of why the juvenile entered DSS custody as well as changed behaviors." Respondent-father has not done this. Respondent-father refuses to acknowledge exactly how Y.Y.E.T. was injured and who perpetrated her injury. Thus, he has clearly failed to acknowledge why his child entered DSS custody, and he has also failed to exhibit changed behaviors. Furthermore, compliance with the case plan is not one of the factors the trial court is to consider in making the best interest determination. See N.C. Gen. Stat. § 7B-1110(a).

In applying the statutory factors that do weigh on the best interest determination, the trial court properly concluded that it would be in Y.Y.E.T.'s best interest to terminate Respondent-father's parental rights. Y.Y.E.T. was four months old when she incurred the leg fracture and was placed in DSS custody. Mecca Harvey ("Harvey"), the permanency planning social worker who was assigned to this matter in November 2007, testified at the 6 May 2009 hearing that there were no barriers to the child's adoption, which was her permanent plan. Harvey also testified that the child was "observably attached to the foster parent[,]" and was "always very happy and very playful" with the foster parent. In the parenting capacity evaluation, Max Nunez noted that the child interacted appropriately with Respondents and that the child "was calm and responsive to them and seemed comfortable in their presence[.]" Additionally, the trial court made the following pertinent findings:

55) There are no barriers to the current foster parents adopting the child except for termination of the respondent-mother and respondent-father's parental rights.

56) The juvenile has been in the same foster home since initial removal from the respondent-parents in August 2007. *The juvenile appears comfortable with and attached to the foster parent.* The juvenile has not sustained any other significant injuries since removal from the respondent-mother and respondent-father.

(Emphasis added).

Based on the foregoing, the trial court made the following conclusions of law:

14) The juvenile would be at risk if placed back in the home with the respondent-mother and/or the respondent-father because the perpetrator of the juvenile's injuries has never been identified.

15) The goal for the juvenile is adoption, and the Court concludes that adoption is in the juvenile's best interest for the sake of permanence, safety, and protection.

16) Pursuant to N.C. Gen. Stat. § 7B-1110, it is in the juvenile's best interest that the parental rights of respondent-mother and respondent-father be terminated in order for the juvenile to be cleared for adoption. It is contrary to the best interest of the juvenile to return to the respondent-mother and/or the respondent-father.

In considering the factors delineated in N.C. Gen. Stat. § 7B-1110(a) as they apply to the present matter, we hold that the trial court did not abuse its discretion in concluding that it would be in Y.Y.E.T.'s best interest to terminate the parental rights of Respondent-father.

Accordingly, the order of the trial court is

AFFIRMED.

Judges HUNTER, ROBERT C. and GEER concur.