IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-92

No. COA20-677

Filed 6 April 2021

Catawba County, Nos. 18 JA 235-236

IN THE MATTERS OF J.M., N.M.

Appeal by Respondents from order entered 12 February 2020 by Judge Burford A. Cherry in Catawba County District Court. Heard in the Court of Appeals 24 February 2021.

*Lauren Vaughan for petitioner-appellee Catawba County Department of Social Services.*

*Michelle F. Lynch for Guardian ad Litem.*

*David Perez for Respondent-Appellant-Mother.*

*J. Lee Gilliam for Respondent-Appellant-Father.*

WOOD, Judge.

¶ 1 Respondent-Mother and Respondent-Father appeal a permanency planning order eliminating reunification from the children's permanent plan. We reverse and remand.

## I.   Background

Jon[1] was born on April 20, 2017 and Nellie was born on July 3, 2018. Jon and Nellie have two older half-siblings, ages 10 and 14. Jon and Nellie's half-siblings are Respondent-Mother's children from a prior relationship, and resided in the home with Respondents, Jon, and Nellie. Nellie was briefly hospitalized after her birth. On August 15, 2018, Nellie exhibited some additional bowel problems and could be heard crying. At approximately 10:30 a.m., Respondent-Father fed Nellie a bottle and changed her diaper. Shortly thereafter, Nellie became completely silent and limp. Respondents took her to the hospital, where a CAT scan showed an acute subdural hematoma. Nellie then was transferred to Levine Children's Hospital ("Levine").

Dr. James LeClair ("Dr. LeClair"), a radiologist, and Dr. Patricia Morgan ("Dr. Morgan"), a board-certified child-abuse pediatrician, examined Nellie at Levine. Dr. LeClair reviewed Nellie's CAT scan and found two areas of bleeding and an ischemic infarct. Dr. LeClair categorized these injuries as resulting from the deprivation of oxygenated blood to Nellie's brain. Dr. LeClair also noted that Nellie's past medical history did not include tonic-clonic seizures that could cause such brain injuries. Nellie was also treated for severe multilayer retinal hemorrhages to both eyes and rib fractures that appeared to be several days old. Dr. Morgan opined that Nellie's injuries were highly specific for child abuse. Since this incident, Nellie has been

---

[1] *See* N.C. R. App. P. 42(b) (pseudonyms are used to protect the identity of the juveniles).

recovering, and the Children's Developmental Service Agency has reported that Nellie has been doing well and making great progress.

¶ 4    On August 21, 2018, the Catawba County Department of Social Services ("DSS") filed a petition alleging that Nellie was abused, neglected, and dependent, and that Jon was neglected and dependent. On the same day, the children were placed in DSS's custody. Respondent-Mother's older two children were left in Respondents' care. DSS did not interview Respondent-Mother's older two children to see if either child knew how Nellie was harmed. Respondents were granted only one hour per month supervised visitation.

¶ 5    Despite the statutory mandate requiring adjudication of the children occur within 60 days of the filing of the petition, the adjudication and disposition hearing regarding Jon and Nellie occurred *nearly a year* after the children were removed from the familial home. *See* N.C. Gen. Stat. § 7B-801(c) (2019) ("The adjudicatory hearing shall be held . . . *no later than 60 days from the filing of the petition*.) (emphasis added). The hearing occurred over several sessions held on May 7, May 22, June 5, and July 2, 2019. On August 26, 2019, more than a year after the petition was filed, Jon was adjudicated neglected, and Nellie was adjudicated abused and neglected. At the disposition hearing on the same day, the trial court determined that the children's proper dispositional alternative was to remain in the custody of DSS with DSS having placement discretion. The trial court ordered Respondents to enter into specific case

plans to work toward reunification with the children. Based on statements made by Respondents to social workers and police about persons responsible for the care of Nellie, the court accepted that Jon and Nellie were in Respondents' exclusive custody and care, and thus, they were responsible for any harm done to Nellie. Respondents were granted one hour per week supervised visitation.

¶ 6        Although Respondents could not be required to do so, Respondents entered into, complied with, and substantially completed their case plans developed by DSS prior to Jon and Nellie's adjudication. In the adjudication order, the trial court specifically noted Respondents' substantial progress toward completing their case plans.

¶ 7        Respondent-Mother's case plan required her to complete a full psychological evaluation; collaborate with social workers to learn proper disciplinary techniques; watch the short film "Period of Purple Crying" and prepare a report; submit to random drug testing; abstain from recreational drug use; complete substance abuse counseling; complete a domestic violence assessment; and obtain and maintain stable housing and employment.

¶ 8        Respondent-Mother had complied with and substantially completed this plan prior to the adjudication. Specifically, Respondent-Mother completed a full psychological evaluation in March 2019; participated in substance abuse and domestic violence counseling; participated in individual and group therapy; and

watched "Period of Purple Crying" and prepared a report for the social worker. Respondent-Mother also completed a comprehensive clinical assessment; submitted to drug screens, all of which returned negative results; attended "domestic violence/life skills classes"; maintained independent housing; and obtained employment. Respondent-Mother arranged to attend Triple P Parenting sessions. DSS also included in its adjudication report that Respondent-Mother consistently acted appropriately during visits with the children and that she had put safeguards in place throughout her home to protect the children. In therapy, Respondent-Mother expressed her concern that Respondent-Father could have caused Nellie's injuries. Due to this concern, Respondent-Mother required Respondent-Father to move out of the familial home.

¶ 9 Respondent-Father's case plan required him to complete a full psychological evaluation; collaborate with social workers to learn proper disciplinary and coping mechanisms; submit to random drug testing; abstain from recreational drug use; complete a substance abuse assessment and comply with any associated treatment recommendations; and obtain and maintain stable housing and employment.

¶ 10 Respondent-Father completed all necessary appointments for his first psychological exam by March 2019; discussed appropriate coping and disciplinary mechanisms with social workers; watched the short film "Period of Purple Crying" and prepared a report; completed a comprehensive clinical assessment that

addressed substance abuse and mental health; and submitted to all drug screens, only the first of which returned a positive result.

¶ 11 Respondent-Father also completed a domestic violence assessment in January 2019; obtained independent housing, separate from Respondent-Mother; and maintained employment. Respondent-Father completed an additional court ordered psychological exam, because the therapist was concerned he was "not completely forthcoming during the course of the evaluation," and his responses indicated deception. Although the therapist noted Respondent-Father "externaliz[ed] blame," she was able to recommend services to Respondent-Father.

¶ 12 At the November 4, 2019 permanency planning hearing, DSS reported further compliance by Respondents with their case plans. Respondent-Father consistently exhibited appropriate behavior during visits with the children; regularly attended therapy; and maintained stable housing and employment. Respondent-Father completed all necessary appointments for his second psychological evaluation on October 16, 2019. The therapist noted Respondent-Father's "positive progress on his case plan over the past year." However, the therapist expressed her concern over the seriousness of Nellie's injuries and recommended Respondent-Father "continue to participate in counseling to address the stresses of parenting, manage those stresses effectively and guard against increased risk of aggressive behavior." Respondent-Mother enrolled in an online Triple P Parenting course and maintained stable

housing and employment. Both Respondents continued to test negative at required drug screens.

¶ 13    The trial court ordered a primary plan of reunification and a secondary plan of adoption. The trial court also ordered DSS to make reasonable efforts to finalize both plans. The trial court ordered Respondents to comply with their case plans and significantly increased Respondents' supervised visitation with the children from one to three hours per week. DSS had the discretion to increase weekly supervised visitation to four hours.

¶ 14    On February 12, 2020, another permanency planning hearing was held. Prior to the hearing, and in addition to Respondents' conduct discussed *supra*, Respondent-Father completed an online Triple P Parenting course, and Respondent-Mother had begun her online parenting course. Respondent-Mother also provided completion certificates for two Triple P Positive Parenting Workshops. DSS and the children's foster parents, who supervised Respondents' visitations, reported no concerns about Respondents' interactions with their children. DSS recommended a primary plan of reunification and a secondary plan of adoption. The Guardian *ad Litem* recommended a primary plan of adoption with a secondary plan of reunification, as the cause of Nellie's injury remained unexplained.

¶ 15    At the hearing, the children's foster mother, who had been engaging in shared parenting with Respondents and supervising Respondents' visitation, testified that

the children "have a good bond" with Respondent-Father, and she never observed any inappropriate behavior by Respondent-Father. She further testified that she had no safety concerns with Respondent-Father and the children. The foster mother testified Respondent-Mother was an attentive mother who appeared to have a good bond with the children. She further testified she saw no cause for concern and noted no safety concerns during Respondent-Mother's visits with the children. The trial court acknowledged Respondents' "strong bond" with the children.

¶ 16 Respondent-Mother acknowledged at the February 2020 permanency planning hearing that Nellie's injuries likely were nonaccidental. However, she did not admit to causing Nellie's injuries nor could she affirmatively state, under oath, Respondent-Father or anyone else caused Nellie's injuries. Respondent-Mother repeatedly informed the trial court she could not explain Nellie's injuries, as "[she] didn't see her get hurt," and "[w]hatever happened to her, I didn't – I don't know what it was 'cause [sic] I wasn't there." Respondent-Father testified that "[i]f [he] knew, [he] would have told [the court] by now." Respondents have remained adamant that they do not know how the child was injured.

¶ 17 On March 17, 2020, the trial court entered its order, noting Respondents' progress as discussed *supra*. The trial court also found:

> 20. The purpose of the parents' case plans is to address the issue that brought these children before the Court and into foster care, i.e. the nonaccidental [*sic*] traumatic and life-

threatening injuries to the minor child [Nellie] while in the care of her parents. As of this date, neither parent has offered any better explanation for these injuries than they offered at the adjudication of this matter or at any hearing since. Without some acknowledgement by the parents of responsibility for the injuries, there can be no mitigation of the risk of the harm to the children.

21. In her testimony today, the Mother has stated that she acknowledges that her child suffered nonaccidental injury; however, she does not know how. Her position is that, if the father was a danger to the child at the time of the removal, he is not a danger now.

. . .

23. The injuries to the minor child [Nellie] which brought these children before the Court included two subdural hematomas caused by abusive head trauma . . . . In addition, [Nellie] sustained multiple retinal hemorrhages [], and a posterior rib fractures [*sic*] . . . . Although the parents have participated and completed services, neither has acknowledged responsibilities for these nonaccidental abusive injuries to [Nellie]. Without that acknowledgement, the Court has no evidence that either parent will protect their children over protecting one another, and therefore the risk to these children of abuse and neglect remains high.

24. Therefore, it is possible, however, unlikely that the minor children will return to the home of a parent within six months for the reasons set forth above. The most appropriate permanent plans are now a primary plan of equal adoption and guardianship and a secondary plan of custody. The barriers to a primary plan of adoption and guardianship include identifying a guardian for the children. Barriers to a secondary plan of custody include identifying a court approved family to assume custody of the children.

> 25. Although the concurrent primary plans include
> adoption, the Court is not convinced that adoption will be
> in the children's best interest due to the bond with their
> parents. Therefore, the Court finds that filing a
> termination of parental rights action at this time is not in
> the best interest of the children. It may be appropriate to
> file such action after further assessment.

Thus, as neither Respondent admitted to causing Nellie's injuries, and maintained their position that neither of them purposefully harmed her, the court abandoned reunification efforts. In ceasing reunification efforts, the trial court made several conclusions of law. These conclusions included "[r]eturn to the home of the parents is contrary to the best interest of the children, and is contrary to the health, safety, and welfare of the children," and "[f]urther efforts to reunify with the children . . . would clearly be unsuccessful and inconsistent with the children's health and safety . . . ." The primary plan changed to adoption and guardianship, with a secondary plan of custody. Nonetheless, the trial court also increased the minimum required visitation to four hours per week of supervised visitation. Respondents timely appealed.

## II. Standards of Review

This Court "reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to

disposition." *In re C.M.*, 183 N.C. App. 207, 213, 644 S.E.2d 588, 594 (2007) (citations omitted); *In re D.A.*, 258 N.C. App. 247, 249, 811 S.E.2d 729, 731 (2018) (citation omitted). "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *In re N.G.*, 186 N.C. App. 1, 10–11, 650 S.E.2d 45, 51 (2007) (citation and internal quotation marks omitted), *aff'd per curiam*, 362 N.C. 229, 657 S.E.2d 355 (2008).

¶ 20 The determination of parental unfitness or whether parental conduct is inconsistent with the parents' constitutionally protected status is reviewed *de novo*. *In re D.A.*, 258 N.C. App. at 249, 811 S.E.2d at 731. Under *de novo* review, the appellate court "considers the matter anew and freely substitutes judgment for that of the lower tribunal." *Id.* (alterations, citations and internal quotations omitted).

## III. Analysis

¶ 21 Respondents raise several arguments on appeal. Each will be addressed in turn.

### A. Respondent-Mother's Compliance with Reunification Efforts

¶ 22 Respondent-Mother first contends the trial court erred when it ceased reunification efforts. We agree.

¶ 23 This Court reviews the order to cease reunification:

> [to] consider whether the trial court's order contains the necessary statutory findings to cease reunification efforts. Under our statutes: "Reunification shall remain a primary or secondary plan unless the court made findings under

> [N.C. Gen. Stat. §] 7B-901(c) or makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b) (2017). . . . The court could only cease reunification efforts after finding that those efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.

*In re D.A.*, 258 N.C. App. at 253, 811 S.E.2d at 733–34.

Under our statutes, reunification whenever possible is the goal of juvenile court. The trial court may cease reunification efforts only upon supported findings "that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b); *In re D.A.*, 258 N.C. App. at 253, 811 S.E.2d at 733-34; *In re K.L.*, 254 N.C. App. 269, 274, 802 S.E.2d 588, 592 (2017). In making this determination, the trial court considers

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C. Gen. Stat. § 7B-906.2(d) (2019). The focus of this statute is on the actions of the parents. While the trial court is not mandated to use the precise language of Section 7B-906.2(d), the order must embrace the substance of the statutory provisions

requiring findings of fact that further reunification efforts would be futile or inconsistent with the juvenile's health, safety, or need for a safe, permanent home within a reasonable period of time. *See In re K.R.C.*, 374 N.C. 849, n.7, 845 S.E.2d 56, n. 7 (2020).

¶ 25 The trial court's order, DSS's evaluation, and the Guardian *ad Litem*'s observations do not constitute evidence to support specific findings addressing any of the factors in Section 7B-906.2(d). To the contrary, the evidence in the record and the trial court's findings address Respondents' compliance with and substantial completion of their case plans, entered and substantially completed prior to the adjudication.

¶ 26 Here, the trial court removed reunification for the sole reason that neither Respondent would accept responsibility for or blame the other for Nellie's purported non-accidental traumatic injuries. Despite Respondent-Mother's substantial compliance with and completion of her case plan; the foster mother's testimony that there were no safety concerns with Respondent-Mother's interactions with her children; DSS's and the Guardian *ad litem*'s recommendations that reunification efforts continue; and Respondent-Mother's older two children remaining in her custody and care, the trial court found reunification efforts would be inconsistent with Jon and Nellie's health and safety.

¶ 27 There is no evidence that Respondent-Mother failed to exhibit appropriate

disciplinary techniques, coping mechanisms, appropriate parenting, or otherwise provide a safe environment for her children after they were removed from her care. Respondent-Mother consistently expressed her desire to reunify with the minor children. Prior to the February 2020 permanency planning hearing, Respondent-Mother's therapist sent a letter to her attorney stating "[i]t is paramount to [Respondent-Mother's] mental and emotional well-being that [she] experience substantial progress in being reunited with her children. There appears to be no observable or reported barriers to unsupervised or overnight visits with her children."

¶ 28        The trial court did not make any findings of fact suggesting Respondent-Mother could not take care of her children. In fact, the evidence demonstrated Respondent-Mother could care appropriately for Jon and Nellie, as her older two children had remained unharmed in her care. Further, Respondent-Mother required Respondent-Father, whom the trial court had deemed the most likely cause of Nellie's injuries, to move out of the familial home. By doing so, Respondent-Mother removed all known potential risks to the health and safety of her children. *See In re Eckard*, 148 N.C. App. 541, 545-46, 559 S.E.2d 233, 235 (2002). Thus, the evidence presented before the trial court was not only insufficient to support ceasing reunification efforts, but contradictory to its finding that reunification would be unsuccessful or inconsistent with the children's health or safety.

¶ 29        In arguing this Court should affirm the trial court's cessation of reunification

efforts, DSS and the Guardian *ad Litem* rely on *In re Y.Y.E.T.*, 205 N.C. App. 120, 695 S.E.2d 517 (2010). We agree with the holding in *Y.Y.E.T.* that the parents' case plans are not merely checklists.  Parents must engage in the services in their case plans as well as be able to objectively demonstrate that they have learned from and have benefitted from the services. The goal of the case plan is to identify services that will assist the parents in correcting the conditions that led to the removal of the children.  In *Y.Y.E.T.*, this Court affirmed the decision of the trial court to terminate the parents' rights as neither would accept responsibility for the nonaccidental traumatic injuries of a four-month-old-child. *Id.* at 130-32, 695 S.E.2d at 522-24. Neither parent would even admit the child suffered nonaccidental injuries or explained their two-day delay in seeking medical care for the child. *Id.* at 122-23, 695 S.E.2d at 519. No other children resided in Y.Y.E.T.'s home, and the individuals who performed the parents' parental capacity evaluations were unable to make recommendations for services for the parents. *Id.*

¶ 30        Here, Respondent-Mother not only completed a comprehensive clinical assessment, but she complied with all recommended services to her therapist's satisfaction, *prior* to Jon and Nellie's adjudication.  Further, the psychologist who performed her evaluation found Respondent-Mother to be engaged in services and benefitting from the recommended services detailed in her case plan. On more than one occasion, Respondent-Mother acknowledged Nellie's injuries were nonaccidental.

She did not admit to harming Nellie, nor could she affirmatively state, under oath, that Respondent-Father or anyone else had done so because she did not witness Nellie's harm. Respondent-Mother repeatedly told the trial court that she did not know what happened, as she was not in the room when Nellie was injured.

¶ 31 A review of the record and transcript shows Respondent-Mother complied with and substantially completed her case plan; acknowledged what brought Jon and Nellie into DSS's care; and exhibited changed behaviors, including installing safeguards in the familial home and requiring Respondent-Father to move out of the home. The record is replete with evidence that Respondent-Mother engaged in all services required of her in order to correct the conditions that led to the removal of the children and that she had objectively learned from and benefitted from the services. The reports from DSS and the Guardian *ad Litem*, as well as letters from the mother's therapist, relate to the court that Respondent-Mother was able to demonstrate changed behaviors as a result of what she had learned from the services that were provided. No evidence to the contrary was introduced or admitted.

¶ 32 Thus, a finding and conclusion that reunification efforts would be unsuccessful or inconsistent with the children's health, safety, and need for a permanent home is contradictory to all evidence presented to the trial court. We hold its findings and conclusions of law that reunification efforts would be futile is unsupported by clear and convincing evidence and does not meet the mandatory requirements of N.C. Gen.

Stat. § 7B-906.2(b). *See In re L.M.T.*, 367 N.C. App. 165, 167-68, 752 S.E.2d 453, 455 (2013).

**B. Respondent-Father's Compliance with Reunification Efforts**

¶ 33    Respondent-Father first contends there was insufficient evidence to support ceasing reunification efforts. We agree.

¶ 34    The court shall not cease reunification efforts without supported findings of fact and conclusions of law which state continued efforts would be unsuccessful or inconsistent with the children's health or safety. *In re P.T.W.*, 250 N.C. App. 589, 595, 794 S.E.2d 843, 848 (2016); *In re D.A.*, 258 N.C. App at 253, 811 S.E.2d at 733-34. The trial court's order, DSS's evaluation, and the Guardian *ad Litem*'s observations do not provide any evidence to support findings specifically addressing any of the factors in Section 7B-906.2(d) or otherwise demonstrate how reunification would be inconsistent with the children's health or safety.

¶ 35    No evidence tends to show that Respondent-Father acted inappropriately toward the children after they left his care. Respondent-Father was observed implementing appropriate disciplinary techniques and coping mechanisms. Respondent-Father has consistently expressed a desire to reunify with his children, and demonstrated changed behaviors as a result of what he learned from the services provided. The trial court's findings of fact reflect that Respondent-Father completed all of the weekly sessions in the Mate Abuser Treatment Program, and he was

projected to complete all domestic violence classes for perpetrators in April 2020. No evidence to the contrary was introduced or admitted. Thus, the trial court's findings of fact, reflecting Respondent-Father's progress, directly contradict its conclusion that reunification would be unsuccessful or inconsistent with the health or safety of his children.

¶ 36       DSS and the Guardian *ad Litem* also rely on *In re Y.Y.E.T.* to support ceasing reunification efforts with Respondent-Father. In *Y.Y.E.T.*, the parental evaluator deemed his evaluation of the parents "invalid," and thus, could not make any recommendations for services. *In re Y.Y.E.T.*, 205 N.C. App. at 123, 695 S.E.2d at 519. Further, the child in *Y.Y.E.T.* was in the exclusive care of the parents. *Id.* In contrast, Respondent-Father was recommended numerous services and participated in and completed all recommendations, including a domestic violence assessment and the Mate Abuser Treatment program. Although Respondent-Father's initial psychological evaluation indicated deception, he complied with the services recommended by his therapist. Respondent-Father underwent a second psychological evaluation, where he "was more open and forthcoming." Respondent-Father was recommended additional counseling services after his second evaluation. Although Respondents were Jon and Nellie's primary caregivers, two other children resided in the home, and DSS failed to interview those children in investigating Nellie's injuries. Respondent-Father has consistently stated that he does not know how the minor child

was injured. No evidence to the contrary was introduced or admitted.

¶ 37  Respondent-Father's appeal is more akin to *In re D.A.*, 258 N.C. App. 247, 811 S.E.2d 729. *In re D.A.* concerned an abused juvenile, where allegations of abuse arose from rib fractures noted on a skeletal survey. *Id.* at 248, 811 S.E.2d at 730-31. This Court found insufficient evidence to support the trial court's findings that reunification would be inconsistent with the child's health and safety where the trial court's findings were "more directed at [the mother's] failure to admit she had caused D.A.'s injuries . . . ." Here, the trial court's findings were directed at the failure of either Respondent to acknowledge responsibility for Nellie's injuries, and it found that due to that lack of acknowledgement there is "no evidence that either parent will protect their children over protecting one another." The evidence in the record does not support a finding that either parent is protecting the other.

¶ 38  The trial court found Respondent-Father participated in and completed services; heard evidence that Respondent-Mother and the children's foster mother, who supervised his visitation with the children, did not have safety concerns about Respondent-Father with the children; and recognized Respondent-Father had completed all the weekly sessions in the Mate Abuser Treatment Program. Respondent-Father was projected to complete all domestic violence classes in April 2020. The evidence presented before the trial court demonstrated Respondent-Father had also changed his behavior as a result of what he had learned from the services

provided. Despite noting Respondent-Father's substantial progress thus far, the trial court ceased reunification efforts. The trial court's order does not make "findings that embrace the requisite ultimate finding that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." *See Id.* at 254, 811 S.E.2d at 734.

### C.     Respondents' Right to File a Motion to Review

¶ 39          Next, both Respondents contend the trial court erred in failing to advise them of their right to file a motion to review the visitation plan. We disagree.

¶ 40          Here, DSS retained nonsecure custody and the trial court was statutorily mandated to conduct a periodic review of Jon and Nellie's case. *See* N.C. Gen. Stat. § 7B-906.1(a). Section 7B-906.1(a) requires permanency planning hearings on a periodic basis, where the trial court reviews the progress made in finalizing a permanent plan for the juvenile(s). As the trial court is required to determine "whether there is a need to create, modify, or enforce an appropriate visitation plan in accordance with [N.C. Gen. Stat. §] 7B-905.1," the visitation plan is reviewed at least once every six months. *See* N.C. Gen. Stat. §§ 7B-905.1 and 7B-906.1(a), (d).

¶ 41          Section 7B-905.1 of our General Statutes addresses visitation for parents in abuse, neglect, and dependency proceedings. Respondents contend the trial court was required to advise them of their right to file a motion to review the visitation plan under Section 7B-905.1(d). We agree with DSS and the Guardian *ad Litem*'s

contention that the application of Section 7B-905.1(d) is limited to instances where the trial court is not otherwise mandated to review the visitation plan.

¶ 42        Section 7B-905.1(d) provides, "[i]f the court retains jurisdiction, all parties shall be informed of the right to file a motion to review the visitation plan . . . ." N.C. Gen. Stat. § 7B-905.1(d) (2019). Thus, subsection (d)'s application is limited to instances where the trial court retains jurisdiction, but is not otherwise mandated to conduct such reviews. *See* N.C. Gen. Stat. § 7B-905.1(d); *In re J.L.*, 264 N.C. App. 408, 422, 826 S.E.2d 258, 268-69 (2019) (Finding error where the trial court granted custody to a nonparent and failed to inform the mother of her right to review the visitation plan).

¶ 43        This Court has not held, and we decline to do so today, that the trial court is obligated to advise parents of their right to file a motion to review the visitation plan where the trial court is statutorily mandated to hold permanency planning hearings at least every six months. *See* N.C. Gen. Stat. § 7B-906.1(a). Respondents' assignment of error is without merit.

**D. DSS's Reasonable Efforts**

¶ 44        Next, Respondent-Father argues the trial court erred in concluding DSS made reasonable efforts to reunify and eliminate the need for placement of the children. Specifically, Respondent-Father argues DSS should have investigated all potential causes of Nellie's nonaccidental traumatic injuries by interviewing Respondent-

Mother's two older children. We agree.

¶ 45 "Our General Assembly requires social service agencies to undertake reasonable, not exhaustive, efforts towards reunification." *In re: A.A.S, A.A.A.T., J.A.W.*, 258 N.C. App. 422, 430, 812 S.E.2d 875, 882 (2018). "Reasonable efforts" is defined as "[t]he diligent use of preventive or reunification services by a department of social services when a juvenile's remaining at home or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat. § 7B-101(18) (2019).

¶ 46 Here, DSS attempted to locate a relative placement; completed safety assessments; aided in the development and implementation of case plans; supervised visitations; arranged psychological and substance abuse assessments; and conducted Child and Family Team Meetings. However, DSS did not interview Respondent-Mother's older two children in the home during their investigation of Nellie's injuries.

¶ 47 DSS offers no reason why it failed to interview Respondent-Mother's older children. The trial court found, in the adjudication order, Jon and Nellie were under Respondents' exclusive custody and care based on the statements made by the Respondents to social workers and police regarding their care of Nellie. It is unreasonable to presume, however, that parents have eyes on their children at all times. Parents and children must sleep at some point, and presumably, parents must tend to other children or to household needs, allowing for children to be left without

eyes-on supervision for some periods of time, no matter how short.

¶ 48 Pursuant to N.C. Gen. Stat. § 7B-300, DSS is required "to establish protective services for juveniles alleged to be abused, neglected, or dependent. [The p]rotective services shall include the screening of reports, the performance of an assessment using either a family assessment response or an investigative assessment response . . . ." N.C. Gen. Stat. § 7B-300 (2019). This Court in its discretion takes judicial notice that the policies and protocols that guide and govern family assessments and investigative assessments, "CPS Family and Investigative Assessments, Policy, Protocol, and Guidance," ("DSS's Assessment Manual"), are found in North Carolina's Child Welfare Manual published by the North Carolina Department of Health and Human Services. *See* N.C. Gen. Stat. § 8C-1, Rule 201 (2019).

¶ 49 The "purpose of the [Child Protective Services] Assessment is to . . . determine if . . . [t]he child is safe within the home and, if not, what interventions can be implemented that will ensure the child's protection and maintain the family unit intact if reasonably possible." N.C. Dep't of Health & Hum. Servs., *CPS Family and Investigative Assessments Policy, Protocol, and Guidance*, 1 (July 2019), https://policies.ncdhhs.gov/divisional/social-services/child-welfare/policy-manuals/modified-manual-1/assessments.pdf.

¶ 50 DSS can approach an instance of alleged neglect, abuse, and dependency

through a "Family Assessment," or "Investigative Assessment.[2]" Both methods require face-to-face interviews with *all children residing in the home*. N.C. Dep't of Health & Hum. Servs*., CPS Family and Investigative Assessments Policy, Protocol, and Guidance*, 64, 69 (July 2019), https://policies.ncdhhs.gov/divisional/social-services/child-welfare/policy-manuals/modified-manual-1/assessments.pdf. (emphasis added).

¶ 51 Here, DSS did not interview Jon and Nellie, the alleged victim children due to their young age. Nor did DSS interview Respondent-Mother's older two children, ages 10 and 14, who resided in the familial home with Respondents, Jon, and Nellie. Thus, DSS did not interview all children residing in the home and could not have diligently investigated all potential causes of Nellie's injuries. *See In re K.L. & J.L. II*, ___ N.C. App. ___, ___, 845 S.E.2d 182, 191-92 (2020) (Where a DSS social worker interviewed the other child in the home to determine how he was disciplined and if he knew how his younger sibling was injured). Therefore, we hold DSS failed to make reasonable

---

[2] According to DSS's "CPS and Investigative Assessment," published in July 2019, "[t]o assess reports of abuse, neglect, and/or dependency, each county child welfare services agency may use either The Family Assessment Response; or the Investigative Assessment Response." "The Family Assessment track is a response to selected reports of child neglect and dependency using a family-centered approach that is protection- and prevention-oriented and that evaluates the strengths and needs of the juvenile's family, as well as the condition of the juvenile. The Family Assessment track is based on family support principles and offers a much less adversarial approach to a CPS Assessment." "The Investigative Assessment track is a response to reports of child abuse and selected reports of child neglect and dependency using a formal information gathering process to determine whether a juvenile is abused, neglected, or dependent."

efforts to promptly reunify Respondents with the minor children.

**E. Respondent-Father's Constitutionally Protected Parental Status**

¶ 52    Lastly, Respondent-Father contends the trial court erred in failing to make findings regarding his constitutionally protected parental status. We agree. "A parent has an interest in the companionship, custody, care, and control of his or her children that is protected by the United States Constitution." *Boseman v. Jarrell*, 364 N.C. 537, 549, 704 S.E.2d 494, 502 (2010) (alterations, quotation marks, and citation omitted). "So long as a parent has this paramount interest in the custody of his or her children, a custody dispute with a nonparent regarding those children may not be determined by the application of the best interest standard." *Id.* at 549, 704 S.E.2d at 503 (citation and quotation marks omitted). However, a parent can forfeit their right to custody of their child by unfitness or acting inconsistently with their constitutionally protected status. *Id.*

¶ 53    A determination that a parent has forfeited this status must be based on clear and convincing evidence. *In re D.A.*, 258 N.C. App. at 249, 811 S.E.2d at 731; *Weideman v. Shelton*, 247 N.C. App. 875, 880, 787 S.E.2d 412, 417 (2016). The trial court must clearly address whether the parent is unfit or if their conduct has been inconsistent with their constitutionally protected status as a parent, where the trial court considers granting custody or guardianship to a nonparent. *In re B.G.*, 197 N.C. App. 570, 574, 677 S.E.2d 549, 552 (2009); *In re J.L.*, 264 N.C. App. 408, 419, 826 S.E.

258, 266 (2019).

¶ 54 The trial court's insistence for Respondents to admit blame as a pre-condition to continuing reunification and as a basis to cease reunification has no lawful basis without the threshold finding of unfitness or conduct inconsistent with their constitutionally protected status as a parent. The fact Nellie suffered injuries does not, by itself, prove Respondents harmed her, were neglectful, or acted inconsistently with their constitutionally protected parental status.

## IV. Conclusion

¶ 55 Reunification shall remain "a primary or secondary plan unless the court made findings under [N.C. Gen. Stat. §§] 7B-901(c) or [] 7B-906.1(d)(3), the permanent plan is or has been achieved . . . or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b). A trial court may cease reunification efforts only when the written findings comply with N.C. Gen. Stat. §§ 7B-901(c) and 7B-906.1(d)(3).

¶ 56 We hold the trial court's findings are unsupported by competent evidence, and its conclusion that reunification is contrary to the children's health and safety is unsupported by its findings. To the contrary, the evidence demonstrated that Respondents substantially completed their respective case plans as required by the court and objectively demonstrated changed behaviors as a result of what they

learned from the services provided in order to reunify with their minor children. Accordingly, we reverse and remand for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Judges TYSON and COLLINS concur.