IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-92

 No. COA20-677

 Filed 6 April 2021

 Catawba County, Nos. 18 JA 235-236

 IN THE MATTERS OF J.M., N.M.

 Appeal by Respondents from order entered 12 February 2020 by Judge Burford

 A. Cherry in Catawba County District Court. Heard in the Court of Appeals 24

 February 2021.

 Lauren Vaughan for petitioner-appellee Catawba County Department of Social
 Services.

 Michelle F. Lynch for Guardian ad Litem.

 David Perez for Respondent-Appellant-Mother.

 J. Lee Gilliam for Respondent-Appellant-Father.

 WOOD, Judge.

¶1 Respondent-Mother and Respondent-Father appeal a permanency planning

 order eliminating reunification from the children’s permanent plan. We reverse and

 remand.

 I. Background
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

¶2 Jon1 was born on April 20, 2017 and Nellie was born on July 3, 2018. Jon and

 Nellie have two older half-siblings, ages 10 and 14. Jon and Nellie’s half-siblings are

 Respondent-Mother’s children from a prior relationship, and resided in the home with

 Respondents, Jon, and Nellie. Nellie was briefly hospitalized after her birth. On

 August 15, 2018, Nellie exhibited some additional bowel problems and could be heard

 crying. At approximately 10:30 a.m., Respondent-Father fed Nellie a bottle and

 changed her diaper. Shortly thereafter, Nellie became completely silent and limp.

 Respondents took her to the hospital, where a CAT scan showed an acute subdural

 hematoma. Nellie then was transferred to Levine Children’s Hospital (“Levine”).

¶3 Dr. James LeClair (“Dr. LeClair”), a radiologist, and Dr. Patricia Morgan (“Dr.

 Morgan”), a board-certified child-abuse pediatrician, examined Nellie at Levine. Dr.

 LeClair reviewed Nellie’s CAT scan and found two areas of bleeding and an ischemic

 infarct. Dr. LeClair categorized these injuries as resulting from the deprivation of

 oxygenated blood to Nellie’s brain. Dr. LeClair also noted that Nellie’s past medical

 history did not include tonic-clonic seizures that could cause such brain injuries.

 Nellie was also treated for severe multilayer retinal hemorrhages to both eyes and

 rib fractures that appeared to be several days old. Dr. Morgan opined that Nellie’s

 injuries were highly specific for child abuse. Since this incident, Nellie has been

 1 See N.C. R. App. P. 42(b) (pseudonyms are used to protect the identity of the
 juveniles).
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 recovering, and the Children’s Developmental Service Agency has reported that

 Nellie has been doing well and making great progress.

¶4 On August 21, 2018, the Catawba County Department of Social Services

 (“DSS”) filed a petition alleging that Nellie was abused, neglected, and dependent,

 and that Jon was neglected and dependent. On the same day, the children were

 placed in DSS’s custody. Respondent-Mother’s older two children were left in

 Respondents’ care. DSS did not interview Respondent-Mother’s older two children to

 see if either child knew how Nellie was harmed. Respondents were granted only one

 hour per month supervised visitation.

¶5 Despite the statutory mandate requiring adjudication of the children occur

 within 60 days of the filing of the petition, the adjudication and disposition hearing

 regarding Jon and Nellie occurred nearly a year after the children were removed from

 the familial home. See N.C. Gen. Stat. § 7B-801(c) (2019) (“The adjudicatory hearing

 shall be held . . . no later than 60 days from the filing of the petition.) (emphasis

 added). The hearing occurred over several sessions held on May 7, May 22, June 5,

 and July 2, 2019. On August 26, 2019, more than a year after the petition was filed,

 Jon was adjudicated neglected, and Nellie was adjudicated abused and neglected. At

 the disposition hearing on the same day, the trial court determined that the children’s

 proper dispositional alternative was to remain in the custody of DSS with DSS having

 placement discretion. The trial court ordered Respondents to enter into specific case
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 plans to work toward reunification with the children. Based on statements made by

 Respondents to social workers and police about persons responsible for the care of

 Nellie, the court accepted that Jon and Nellie were in Respondents’ exclusive custody

 and care, and thus, they were responsible for any harm done to Nellie. Respondents

 were granted one hour per week supervised visitation.

¶6 Although Respondents could not be required to do so, Respondents entered

 into, complied with, and substantially completed their case plans developed by DSS

 prior to Jon and Nellie’s adjudication. In the adjudication order, the trial court

 specifically noted Respondents’ substantial progress toward completing their case

 plans.

¶7 Respondent-Mother’s case plan required her to complete a full psychological

 evaluation; collaborate with social workers to learn proper disciplinary techniques;

 watch the short film “Period of Purple Crying” and prepare a report; submit to

 random drug testing; abstain from recreational drug use; complete substance abuse

 counseling; complete a domestic violence assessment; and obtain and maintain stable

 housing and employment.

¶8 Respondent-Mother had complied with and substantially completed this plan

 prior to the adjudication. Specifically, Respondent-Mother completed a full

 psychological evaluation in March 2019; participated in substance abuse and

 domestic violence counseling; participated in individual and group therapy; and
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 watched “Period of Purple Crying” and prepared a report for the social worker.

 Respondent-Mother also completed a comprehensive clinical assessment; submitted

 to drug screens, all of which returned negative results; attended “domestic

 violence/life skills classes”; maintained independent housing; and obtained

 employment. Respondent-Mother arranged to attend Triple P Parenting sessions.

 DSS also included in its adjudication report that Respondent-Mother consistently

 acted appropriately during visits with the children and that she had put safeguards

 in place throughout her home to protect the children. In therapy, Respondent-Mother

 expressed her concern that Respondent-Father could have caused Nellie’s injuries.

 Due to this concern, Respondent-Mother required Respondent-Father to move out of

 the familial home.

¶9 Respondent-Father’s case plan required him to complete a full psychological

 evaluation; collaborate with social workers to learn proper disciplinary and coping

 mechanisms; submit to random drug testing; abstain from recreational drug use;

 complete a substance abuse assessment and comply with any associated treatment

 recommendations; and obtain and maintain stable housing and employment.

¶ 10 Respondent-Father completed all necessary appointments for his first

 psychological exam by March 2019; discussed appropriate coping and disciplinary

 mechanisms with social workers; watched the short film “Period of Purple Crying”

 and prepared a report; completed a comprehensive clinical assessment that
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 addressed substance abuse and mental health; and submitted to all drug screens,

 only the first of which returned a positive result.

¶ 11 Respondent-Father also completed a domestic violence assessment in January

 2019; obtained independent housing, separate from Respondent-Mother; and

 maintained employment. Respondent-Father completed an additional court ordered

 psychological exam, because the therapist was concerned he was “not completely

 forthcoming during the course of the evaluation,” and his responses indicated

 deception. Although the therapist noted Respondent-Father “externaliz[ed] blame,”

 she was able to recommend services to Respondent-Father.

¶ 12 At the November 4, 2019 permanency planning hearing, DSS reported further

 compliance by Respondents with their case plans. Respondent-Father consistently

 exhibited appropriate behavior during visits with the children; regularly attended

 therapy; and maintained stable housing and employment. Respondent-Father

 completed all necessary appointments for his second psychological evaluation on

 October 16, 2019. The therapist noted Respondent-Father’s “positive progress on his

 case plan over the past year.” However, the therapist expressed her concern over the

 seriousness of Nellie’s injuries and recommended Respondent-Father “continue to

 participate in counseling to address the stresses of parenting, manage those stresses

 effectively and guard against increased risk of aggressive behavior.” Respondent-

 Mother enrolled in an online Triple P Parenting course and maintained stable
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 housing and employment. Both Respondents continued to test negative at required

 drug screens.

¶ 13 The trial court ordered a primary plan of reunification and a secondary plan of

 adoption. The trial court also ordered DSS to make reasonable efforts to finalize both

 plans. The trial court ordered Respondents to comply with their case plans and

 significantly increased Respondents’ supervised visitation with the children from one

 to three hours per week. DSS had the discretion to increase weekly supervised

 visitation to four hours.

¶ 14 On February 12, 2020, another permanency planning hearing was held. Prior

 to the hearing, and in addition to Respondents’ conduct discussed supra, Respondent-

 Father completed an online Triple P Parenting course, and Respondent-Mother had

 begun her online parenting course. Respondent-Mother also provided completion

 certificates for two Triple P Positive Parenting Workshops. DSS and the children’s

 foster parents, who supervised Respondents’ visitations, reported no concerns about

 Respondents’ interactions with their children. DSS recommended a primary plan of

 reunification and a secondary plan of adoption. The Guardian ad Litem recommended

 a primary plan of adoption with a secondary plan of reunification, as the cause of

 Nellie’s injury remained unexplained.

¶ 15 At the hearing, the children’s foster mother, who had been engaging in shared

 parenting with Respondents and supervising Respondents’ visitation, testified that
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 the children “have a good bond” with Respondent-Father, and she never observed any

 inappropriate behavior by Respondent-Father. She further testified that she had no

 safety concerns with Respondent-Father and the children. The foster mother testified

 Respondent-Mother was an attentive mother who appeared to have a good bond with

 the children. She further testified she saw no cause for concern and noted no safety

 concerns during Respondent-Mother’s visits with the children. The trial court

 acknowledged Respondents’ “strong bond” with the children.

¶ 16 Respondent-Mother acknowledged at the February 2020 permanency

 planning hearing that Nellie’s injuries likely were nonaccidental. However, she did

 not admit to causing Nellie’s injuries nor could she affirmatively state, under oath,

 Respondent-Father or anyone else caused Nellie’s injuries. Respondent-Mother

 repeatedly informed the trial court she could not explain Nellie’s injuries, as “[she]

 didn’t see her get hurt,” and “[w]hatever happened to her, I didn’t – I don’t know what

 it was ‘cause [sic] I wasn’t there.” Respondent-Father testified that “[i]f [he] knew,

 [he] would have told [the court] by now.” Respondents have remained adamant that

 they do not know how the child was injured.

¶ 17 On March 17, 2020, the trial court entered its order, noting Respondents’

 progress as discussed supra. The trial court also found:

 20. The purpose of the parents’ case plans is to address the
 issue that brought these children before the Court and into
 foster care, i.e. the nonaaccidental [sic] traumatic and life-
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

threatening injuries to the minor child [Nellie] while in the
care of her parents. As of this date, neither parent has
offered any better explanation for these injuries than they
offered at the adjudication of this matter or at any hearing
since. Without some acknowledgement by the parents of
responsibility for the injuries, there can be no mitigation of
the risk of the harm to the children.

21. In her testimony today, the Mother has stated that she
acknowledges that her child suffered nonaccidental injury;
however, she does not know how. Her position is that, if the
father was a danger to the child at the time of the removal,
he is not a danger now.

...

23. The injuries to the minor child [Nellie] which brought
these children before the Court included two subdural
hematomas caused by abusive head trauma . . . . In
addition, [Nellie] sustained multiple retinal hemorrhages
[], and a posterior rib fractures [sic] . . . . Although the
parents have participated and completed services, neither
has acknowledged responsibilities for these nonaccidental
abusive injuries to [Nellie]. Without that
acknowledgement, the Court has no evidence that either
parent will protect their children over protecting one
another, and therefore the risk to these children of abuse
and neglect remains high.

24. Therefore, it is possible, however, unlikely that the
minor children will return to the home of a parent within
six months for the reasons set forth above. The most
appropriate permanent plans are now a primary plan of
equal adoption and guardianship and a secondary plan of
custody. The barriers to a primary plan of adoption and
guardianship include identifying a guardian for the
children. Barriers to a secondary plan of custody include
identifying a court approved family to assume custody of
the children.
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 25. Although the concurrent primary plans include
 adoption, the Court is not convinced that adoption will be
 in the children’s best interest due to the bond with their
 parents. Therefore, the Court finds that filing a
 termination of parental rights action at this time is not in
 the best interest of the children. It may be appropriate to
 file such action after further assessment.

¶ 18 Thus, as neither Respondent admitted to causing Nellie’s injuries, and

 maintained their position that neither of them purposefully harmed her, the court

 abandoned reunification efforts. In ceasing reunification efforts, the trial court made

 several conclusions of law. These conclusions included “[r]eturn to the home of the

 parents is contrary to the best interest of the children, and is contrary to the health,

 safety, and welfare of the children,” and “[f]urther efforts to reunify with the children

 . . . would clearly be unsuccessful and inconsistent with the children’s health and

 safety . . . .” The primary plan changed to adoption and guardianship, with a

 secondary plan of custody. Nonetheless, the trial court also increased the minimum

 required visitation to four hours per week of supervised visitation. Respondents

 timely appealed.

 II. Standards of Review

¶ 19 This Court “reviews an order that ceases reunification efforts to determine

 whether the trial court made appropriate findings, whether the findings are based

 upon credible evidence, whether the findings of fact support the trial court’s

 conclusions, and whether the trial court abused its discretion with respect to
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 disposition.” In re C.M., 183 N.C. App. 207, 213, 644 S.E.2d 588, 594 (2007) (citations

 omitted); In re D.A., 258 N.C. App. 247, 249, 811 S.E.2d 729, 731 (2018) (citation

 omitted). “An abuse of discretion occurs when the trial court’s ruling is so arbitrary

 that it could not have been the result of a reasoned decision.” In re N.G., 186 N.C.

 App. 1, 10–11, 650 S.E.2d 45, 51 (2007) (citation and internal quotation marks

 omitted), aff’d per curiam, 362 N.C. 229, 657 S.E.2d 355 (2008).

¶ 20 The determination of parental unfitness or whether parental conduct is

 inconsistent with the parents’ constitutionally protected status is reviewed de novo.

 In re D.A., 258 N.C. App. at 249, 811 S.E.2d at 731. Under de novo review, the

 appellate court “considers the matter anew and freely substitutes judgment for that

 of the lower tribunal.” Id. (alterations, citations and internal quotations omitted).

 III. Analysis

¶ 21 Respondents raise several arguments on appeal. Each will be addressed in

 turn.

 A. Respondent-Mother’s Compliance with Reunification Efforts

¶ 22 Respondent-Mother first contends the trial court erred when it ceased

 reunification efforts. We agree.

¶ 23 This Court reviews the order to cease reunification:

 [to] consider whether the trial court’s order contains the
 necessary statutory findings to cease reunification efforts.
 Under our statutes: “Reunification shall remain a primary
 or secondary plan unless the court made findings under
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 [N.C. Gen. Stat. §] 7B-901(c) or makes written findings
 that reunification efforts clearly would be unsuccessful or
 would be inconsistent with the juvenile’s health or safety.”
 N.C. Gen. Stat. § 7B-906.2(b) (2017). . . . The court could
 only cease reunification efforts after finding that those
 efforts clearly would be unsuccessful or would be
 inconsistent with the juvenile’s health or safety.

 In re D.A., 258 N.C. App. at 253, 811 S.E.2d at 733–34.

¶ 24 Under our statutes, reunification whenever possible is the goal of juvenile

 court. The trial court may cease reunification efforts only upon supported findings

 “that reunification efforts clearly would be unsuccessful or would be inconsistent with

 the juvenile’s health or safety.” N.C. Gen. Stat. § 7B-906.2(b); In re D.A., 258 N.C.

 App. at 253, 811 S.E.2d at 733-34; In re K.L., 254 N.C. App. 269, 274, 802 S.E.2d 588,

 592 (2017). In making this determination, the trial court considers

 (1) Whether the parent is making adequate progress within
 a reasonable period of time under the plan.

 (2) Whether the parent is actively participating in or
 cooperating with the plan, the department, and the
 guardian ad litem for the juvenile.

 (3) Whether the parent remains available to the court, the
 department, and the guardian ad litem for the juvenile.

 (4) Whether the parent is acting in a manner inconsistent
 with the health or safety of the juvenile.

 N.C. Gen. Stat. § 7B-906.2(d) (2019). The focus of this statute is on the actions of the

 parents. While the trial court is not mandated to use the precise language of Section

 7B-906.2(d), the order must embrace the substance of the statutory provisions
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 requiring findings of fact that further reunification efforts would be futile or

 inconsistent with the juvenile’s health, safety, or need for a safe, permanent home

 within a reasonable period of time. See In re K.R.C., 374 N.C. 849, n.7, 845 S.E.2d 56,

 n. 7 (2020).

¶ 25 The trial court’s order, DSS’s evaluation, and the Guardian ad Litem’s

 observations do not constitute evidence to support specific findings addressing any of

 the factors in Section 7B-906.2(d). To the contrary, the evidence in the record and the

 trial court’s findings address Respondents’ compliance with and substantial

 completion of their case plans, entered and substantially completed prior to the

 adjudication.

¶ 26 Here, the trial court removed reunification for the sole reason that neither

 Respondent would accept responsibility for or blame the other for Nellie’s purported

 non-accidental traumatic injuries. Despite Respondent-Mother’s substantial

 compliance with and completion of her case plan; the foster mother’s testimony that

 there were no safety concerns with Respondent-Mother’s interactions with her

 children; DSS’s and the Guardian ad litem’s recommendations that reunification

 efforts continue; and Respondent-Mother’s older two children remaining in her

 custody and care, the trial court found reunification efforts would be inconsistent with

 Jon and Nellie’s health and safety.

¶ 27 There is no evidence that Respondent-Mother failed to exhibit appropriate
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 disciplinary techniques, coping mechanisms, appropriate parenting, or otherwise

 provide a safe environment for her children after they were removed from her care.

 Respondent-Mother consistently expressed her desire to reunify with the minor

 children. Prior to the February 2020 permanency planning hearing, Respondent-

 Mother’s therapist sent a letter to her attorney stating “[i]t is paramount to

 [Respondent-Mother’s] mental and emotional well-being that [she] experience

 substantial progress in being reunited with her children. There appears to be no

 observable or reported barriers to unsupervised or overnight visits with her children.”

¶ 28 The trial court did not make any findings of fact suggesting Respondent-

 Mother could not take care of her children. In fact, the evidence demonstrated

 Respondent-Mother could care appropriately for Jon and Nellie, as her older two

 children had remained unharmed in her care. Further, Respondent-Mother required

 Respondent-Father, whom the trial court had deemed the most likely cause of Nellie’s

 injuries, to move out of the familial home. By doing so, Respondent-Mother removed

 all known potential risks to the health and safety of her children. See In re Eckard,

 148 N.C. App. 541, 545-46, 559 S.E.2d 233, 235 (2002). Thus, the evidence presented

 before the trial court was not only insufficient to support ceasing reunification efforts,

 but contradictory to its finding that reunification would be unsuccessful or

 inconsistent with the children’s health or safety.

¶ 29 In arguing this Court should affirm the trial court’s cessation of reunification
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 efforts, DSS and the Guardian ad Litem rely on In re Y.Y.E.T., 205 N.C. App. 120,

 695 S.E.2d 517 (2010). We agree with the holding in Y.Y.E.T. that the parents’ case

 plans are not merely checklists. Parents must engage in the services in their case

 plans as well as be able to objectively demonstrate that they have learned from and

 have benefitted from the services. The goal of the case plan is to identify services that

 will assist the parents in correcting the conditions that led to the removal of the

 children. In Y.Y.E.T., this Court affirmed the decision of the trial court to terminate

 the parents’ rights as neither would accept responsibility for the nonaccidental

 traumatic injuries of a four-month-old-child. Id. at 130-32, 695 S.E.2d at 522-24.

 Neither parent would even admit the child suffered nonaccidental injuries or

 explained their two-day delay in seeking medical care for the child. Id. at 122-23, 695

 S.E.2d at 519. No other children resided in Y.Y.E.T.’s home, and the individuals who

 performed the parents’ parental capacity evaluations were unable to make

 recommendations for services for the parents. Id.

¶ 30 Here, Respondent-Mother not only completed a comprehensive clinical

 assessment, but she complied with all recommended services to her therapist’s

 satisfaction, prior to Jon and Nellie’s adjudication. Further, the psychologist who

 performed her evaluation found Respondent-Mother to be engaged in services and

 benefitting from the recommended services detailed in her case plan. On more than

 one occasion, Respondent-Mother acknowledged Nellie’s injuries were nonaccidental.
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 She did not admit to harming Nellie, nor could she affirmatively state, under oath,

 that Respondent-Father or anyone else had done so because she did not witness

 Nellie’s harm. Respondent-Mother repeatedly told the trial court that she did not

 know what happened, as she was not in the room when Nellie was injured.

¶ 31 A review of the record and transcript shows Respondent-Mother complied with

 and substantially completed her case plan; acknowledged what brought Jon and

 Nellie into DSS’s care; and exhibited changed behaviors, including installing

 safeguards in the familial home and requiring Respondent-Father to move out of the

 home. The record is replete with evidence that Respondent-Mother engaged in all

 services required of her in order to correct the conditions that led to the removal of

 the children and that she had objectively learned from and benefitted from the

 services. The reports from DSS and the Guardian ad Litem, as well as letters from

 the mother’s therapist, relate to the court that Respondent-Mother was able to

 demonstrate changed behaviors as a result of what she had learned from the services

 that were provided. No evidence to the contrary was introduced or admitted.

¶ 32 Thus, a finding and conclusion that reunification efforts would be unsuccessful

 or inconsistent with the children’s health, safety, and need for a permanent home is

 contradictory to all evidence presented to the trial court. We hold its findings and

 conclusions of law that reunification efforts would be futile is unsupported by clear

 and convincing evidence and does not meet the mandatory requirements of N.C. Gen.
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 Stat. § 7B-906.2(b). See In re L.M.T., 367 N.C. App. 165, 167-68, 752 S.E.2d 453, 455

 (2013).

 B. Respondent-Father’s Compliance with Reunification Efforts

¶ 33 Respondent-Father first contends there was insufficient evidence to support

 ceasing reunification efforts. We agree.

¶ 34 The court shall not cease reunification efforts without supported findings of

 fact and conclusions of law which state continued efforts would be unsuccessful or

 inconsistent with the children’s health or safety. In re P.T.W., 250 N.C. App. 589,

 595, 794 S.E.2d 843, 848 (2016); In re D.A., 258 N.C. App at 253, 811 S.E.2d at 733-

 34. The trial court’s order, DSS’s evaluation, and the Guardian ad Litem’s

 observations do not provide any evidence to support findings specifically addressing

 any of the factors in Section 7B-906.2(d) or otherwise demonstrate how reunification

 would be inconsistent with the children’s health or safety.

¶ 35 No evidence tends to show that Respondent-Father acted inappropriately

 toward the children after they left his care. Respondent-Father was observed

 implementing appropriate disciplinary techniques and coping mechanisms.

 Respondent-Father has consistently expressed a desire to reunify with his children,

 and demonstrated changed behaviors as a result of what he learned from the services

 provided. The trial court’s findings of fact reflect that Respondent-Father completed

 all of the weekly sessions in the Mate Abuser Treatment Program, and he was
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 projected to complete all domestic violence classes for perpetrators in April 2020. No

 evidence to the contrary was introduced or admitted. Thus, the trial court’s findings

 of fact, reflecting Respondent-Father’s progress, directly contradict its conclusion

 that reunification would be unsuccessful or inconsistent with the health or safety of

 his children.

¶ 36 DSS and the Guardian ad Litem also rely on In re Y.Y.E.T. to support ceasing

 reunification efforts with Respondent-Father. In Y.Y.E.T., the parental evaluator

 deemed his evaluation of the parents “invalid,” and thus, could not make any

 recommendations for services. In re Y.Y.E.T., 205 N.C. App. at 123, 695 S.E.2d at 519.

 Further, the child in Y.Y.E.T. was in the exclusive care of the parents. Id. In contrast,

 Respondent-Father was recommended numerous services and participated in and

 completed all recommendations, including a domestic violence assessment and the

 Mate Abuser Treatment program. Although Respondent-Father’s initial

 psychological evaluation indicated deception, he complied with the services

 recommended by his therapist. Respondent-Father underwent a second psychological

 evaluation, where he “was more open and forthcoming.” Respondent-Father was

 recommended additional counseling services after his second evaluation. Although

 Respondents were Jon and Nellie’s primary caregivers, two other children resided in

 the home, and DSS failed to interview those children in investigating Nellie’s injuries.

 Respondent-Father has consistently stated that he does not know how the minor child
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 was injured. No evidence to the contrary was introduced or admitted.

¶ 37 Respondent-Father’s appeal is more akin to In re D.A., 258 N.C. App. 247, 811

 S.E.2d 729. In re D.A. concerned an abused juvenile, where allegations of abuse arose

 from rib fractures noted on a skeletal survey. Id. at 248, 811 S.E.2d at 730-31. This

 Court found insufficient evidence to support the trial court’s findings that

 reunification would be inconsistent with the child’s health and safety where the trial

 court’s findings were “more directed at [the mother’s] failure to admit she had caused

 D.A.’s injuries . . . .” Here, the trial court’s findings were directed at the failure of

 either Respondent to acknowledge responsibility for Nellie’s injuries, and it found

 that due to that lack of acknowledgement there is “no evidence that either parent will

 protect their children over protecting one another.” The evidence in the record does

 not support a finding that either parent is protecting the other.

¶ 38 The trial court found Respondent-Father participated in and completed

 services; heard evidence that Respondent-Mother and the children’s foster mother,

 who supervised his visitation with the children, did not have safety concerns about

 Respondent-Father with the children; and recognized Respondent-Father had

 completed all the weekly sessions in the Mate Abuser Treatment Program.

 Respondent-Father was projected to complete all domestic violence classes in April

 2020. The evidence presented before the trial court demonstrated Respondent-Father

 had also changed his behavior as a result of what he had learned from the services
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 provided. Despite noting Respondent-Father’s substantial progress thus far, the trial

 court ceased reunification efforts. The trial court’s order does not make “findings that

 embrace the requisite ultimate finding that reunification efforts clearly would be

 unsuccessful or would be inconsistent with the juvenile’s health or safety.” See Id. at

 254, 811 S.E.2d at 734.

 C. Respondents’ Right to File a Motion to Review

¶ 39 Next, both Respondents contend the trial court erred in failing to advise them

 of their right to file a motion to review the visitation plan. We disagree.

¶ 40 Here, DSS retained nonsecure custody and the trial court was statutorily

 mandated to conduct a periodic review of Jon and Nellie’s case. See N.C. Gen. Stat. §

 7B-906.1(a). Section 7B-906.1(a) requires permanency planning hearings on a

 periodic basis, where the trial court reviews the progress made in finalizing a

 permanent plan for the juvenile(s). As the trial court is required to determine

 “whether there is a need to create, modify, or enforce an appropriate visitation plan

 in accordance with [N.C. Gen. Stat. §] 7B-905.1,” the visitation plan is reviewed at

 least once every six months. See N.C. Gen. Stat. §§ 7B-905.1 and 7B-906.1(a), (d).

¶ 41 Section 7B-905.1 of our General Statutes addresses visitation for parents in

 abuse, neglect, and dependency proceedings. Respondents contend the trial court was

 required to advise them of their right to file a motion to review the visitation plan

 under Section 7B-905.1(d). We agree with DSS and the Guardian ad Litem’s
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 contention that the application of Section 7B-905.1(d) is limited to instances where

 the trial court is not otherwise mandated to review the visitation plan.

¶ 42 Section 7B-905.1(d) provides, “[i]f the court retains jurisdiction, all parties

 shall be informed of the right to file a motion to review the visitation plan . . . .” N.C.

 Gen. Stat. § 7B-905.1(d) (2019). Thus, subsection (d)’s application is limited to

 instances where the trial court retains jurisdiction, but is not otherwise mandated to

 conduct such reviews. See N.C. Gen. Stat. § 7B-905.1(d); In re J.L., 264 N.C. App. 408,

 422, 826 S.E.2d 258, 268-69 (2019) (Finding error where the trial court granted

 custody to a nonparent and failed to inform the mother of her right to review the

 visitation plan).

¶ 43 This Court has not held, and we decline to do so today, that the trial court is

 obligated to advise parents of their right to file a motion to review the visitation plan

 where the trial court is statutorily mandated to hold permanency planning hearings

 at least every six months. See N.C. Gen. Stat. § 7B-906.1(a). Respondents’ assignment

 of error is without merit.

 D. DSS’s Reasonable Efforts

¶ 44 Next, Respondent-Father argues the trial court erred in concluding DSS made

 reasonable efforts to reunify and eliminate the need for placement of the children.

 Specifically, Respondent-Father argues DSS should have investigated all potential

 causes of Nellie’s nonaccidental traumatic injuries by interviewing Respondent-
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 Mother’s two older children. We agree.

¶ 45 “Our General Assembly requires social service agencies to undertake

 reasonable, not exhaustive, efforts towards reunification.” In re: A.A.S, A.A.A.T.,

 J.A.W., 258 N.C. App. 422, 430, 812 S.E.2d 875, 882 (2018). “Reasonable efforts” is

 defined as “[t]he diligent use of preventive or reunification services by a department

 of social services when a juvenile's remaining at home or returning home is consistent

 with achieving a safe, permanent home for the juvenile within a reasonable period of

 time.” N.C. Gen. Stat. § 7B-101(18) (2019).

¶ 46 Here, DSS attempted to locate a relative placement; completed safety

 assessments; aided in the development and implementation of case plans; supervised

 visitations; arranged psychological and substance abuse assessments; and conducted

 Child and Family Team Meetings. However, DSS did not interview Respondent-

 Mother’s older two children in the home during their investigation of Nellie’s injuries.

¶ 47 DSS offers no reason why it failed to interview Respondent-Mother’s older

 children. The trial court found, in the adjudication order, Jon and Nellie were under

 Respondents’ exclusive custody and care based on the statements made by the

 Respondents to social workers and police regarding their care of Nellie. It is

 unreasonable to presume, however, that parents have eyes on their children at all

 times. Parents and children must sleep at some point, and presumably, parents must

 tend to other children or to household needs, allowing for children to be left without
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 eyes-on supervision for some periods of time, no matter how short.

¶ 48 Pursuant to N.C. Gen. Stat. § 7B-300, DSS is required “to establish protective

 services for juveniles alleged to be abused, neglected, or dependent. [The p]rotective

 services shall include the screening of reports, the performance of an assessment

 using either a family assessment response or an investigative assessment response

 . . . .” N.C. Gen. Stat. § 7B-300 (2019). This Court in its discretion takes judicial notice

 that the policies and protocols that guide and govern family assessments and

 investigative assessments, “CPS Family and Investigative Assessments, Policy,

 Protocol, and Guidance,” (“DSS’s Assessment Manual”), are found in North Carolina’s

 Child Welfare Manual published by the North Carolina Department of Health and

 Human Services. See N.C. Gen. Stat. § 8C-1, Rule 201 (2019).

¶ 49 The “purpose of the [Child Protective Services] Assessment is to . . . determine

 if . . . [t]he child is safe within the home and, if not, what interventions can be

 implemented that will ensure the child's protection and maintain the family unit

 intact if reasonably possible.” N.C. Dep’t of Health & Hum. Servs., CPS Family and

 Investigative Assessments Policy, Protocol, and Guidance, 1 (July 2019),

 https://policies.ncdhhs.gov/divisional/social-services/child-welfare/policy-

 manuals/modified-manual-1/assessments.pdf.

¶ 50 DSS can approach an instance of alleged neglect, abuse, and dependency
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 through a “Family Assessment,” or “Investigative Assessment.2” Both methods

 require face-to-face interviews with all children residing in the home. N.C. Dep’t of

 Health & Hum. Servs., CPS Family and Investigative Assessments Policy, Protocol,

 and Guidance, 64, 69 (July 2019), https://policies.ncdhhs.gov/divisional/social-

 services/child-welfare/policy-manuals/modified-manual-1/assessments.pdf.

 (emphasis added).

¶ 51 Here, DSS did not interview Jon and Nellie, the alleged victim children due to

 their young age. Nor did DSS interview Respondent-Mother’s older two children, ages

 10 and 14, who resided in the familial home with Respondents, Jon, and Nellie. Thus,

 DSS did not interview all children residing in the home and could not have diligently

 investigated all potential causes of Nellie’s injuries. See In re K.L. & J.L. II, ___ N.C.

 App. ___, ___, 845 S.E.2d 182, 191-92 (2020) (Where a DSS social worker interviewed

 the other child in the home to determine how he was disciplined and if he knew how

 his younger sibling was injured). Therefore, we hold DSS failed to make reasonable

 2 According to DSS’s “CPS and Investigative Assessment,” published in July 2019,

 “[t]o assess reports of abuse, neglect, and/or dependency, each county child welfare services
 agency may use either The Family Assessment Response; or the Investigative Assessment
 Response.” “The Family Assessment track is a response to selected reports of child neglect
 and dependency using a family-centered approach that is protection- and prevention-oriented
 and that evaluates the strengths and needs of the juvenile’s family, as well as the condition
 of the juvenile. The Family Assessment track is based on family support principles and offers
 a much less adversarial approach to a CPS Assessment.” “The Investigative Assessment
 track is a response to reports of child abuse and selected reports of child neglect and
 dependency using a formal information gathering process to determine whether a juvenile is
 abused, neglected, or dependent.”
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 efforts to promptly reunify Respondents with the minor children.

 E. Respondent-Father’s Constitutionally Protected Parental Status

¶ 52 Lastly, Respondent-Father contends the trial court erred in failing to make

 findings regarding his constitutionally protected parental status. We agree. “A parent

 has an interest in the companionship, custody, care, and control of his or her children

 that is protected by the United States Constitution.” Boseman v. Jarrell, 364 N.C.

 537, 549, 704 S.E.2d 494, 502 (2010) (alterations, quotation marks, and citation

 omitted). “So long as a parent has this paramount interest in the custody of his or her

 children, a custody dispute with a nonparent regarding those children may not be

 determined by the application of the best interest standard.” Id. at 549, 704 S.E.2d

 at 503 (citation and quotation marks omitted). However, a parent can forfeit their

 right to custody of their child by unfitness or acting inconsistently with their

 constitutionally protected status. Id.

¶ 53 A determination that a parent has forfeited this status must be based on clear

 and convincing evidence. In re D.A., 258 N.C. App. at 249, 811 S.E.2d at 731;

 Weideman v. Shelton, 247 N.C. App. 875, 880, 787 S.E.2d 412, 417 (2016). The trial

 court must clearly address whether the parent is unfit or if their conduct has been

 inconsistent with their constitutionally protected status as a parent, where the trial

 court considers granting custody or guardianship to a nonparent. In re B.G., 197 N.C.

 App. 570, 574, 677 S.E.2d 549, 552 (2009); In re J.L., 264 N.C. App. 408, 419, 826 S.E.
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

 258, 266 (2019).

¶ 54 The trial court’s insistence for Respondents to admit blame as a pre-condition

 to continuing reunification and as a basis to cease reunification has no lawful basis

 without the threshold finding of unfitness or conduct inconsistent with their

 constitutionally protected status as a parent. The fact Nellie suffered injuries does

 not, by itself, prove Respondents harmed her, were neglectful, or acted inconsistently

 with their constitutionally protected parental status.

 IV. Conclusion

¶ 55 Reunification shall remain “a primary or secondary plan unless the court made

 findings under [N.C. Gen. Stat. §§] 7B-901(c) or [] 7B-906.1(d)(3), the permanent plan

 is or has been achieved . . . or the court makes written findings that reunification

 efforts clearly would be unsuccessful or would be inconsistent with the juvenile’s

 health or safety.” N.C. Gen. Stat. § 7B-906.2(b). A trial court may cease reunification

 efforts only when the written findings comply with N.C. Gen. Stat. §§ 7B-901(c) and

 7B-906.1(d)(3).

¶ 56 We hold the trial court’s findings are unsupported by competent evidence, and

 its conclusion that reunification is contrary to the children’s health and safety is

 unsupported by its findings. To the contrary, the evidence demonstrated that

 Respondents substantially completed their respective case plans as required by the

 court and objectively demonstrated changed behaviors as a result of what they
 IN THE MATTERS OF J.M., N.M.

 2021-NCCOA-92

 Opinion of the Court

learned from the services provided in order to reunify with their minor children.

Accordingly, we reverse and remand for further proceedings not inconsistent with

this opinion.

 REVERSED AND REMANDED.

 Judges TYSON and COLLINS concur.